# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:15-cr-00010-TLS-SLC |
| | ) | |
| DEWAYNE LEWIS | ) | |

## REPORT AND RECOMMENDATION

Before the Court are pro se[1] Defendant Dewayne Lewis's consolidated motion to dismiss

indictment/suppress evidence (DE 33), Lewis's motion to quash search warrant (DE 72), and

Lewis's second motion to amend hearing issue (DE 85). These matters have been referred to the

undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b).

(DE 57). An evidentiary hearing regarding these matters was held on February 9-10, 2016. (DE

110 & DE 111).[2] After the evidentiary hearing, Lewis filed a post-hearing brief regarding the

pending matters. (DE 169). The government filed its post-hearing response brief (DE 186), and

Lewis filed a post-hearing reply (DE 189). Thereafter, Lewis moved for a supplemental

evidentiary hearing (DE 198), and the undersigned held a supplemental evidentiary hearing on

January 27, 2017 (DE 252).[3] After the supplemental evidentiary hearing, Lewis filed a

---

[1] While Lewis has chosen to represent himself in this action, the Court ordered the appointment of standby counsel to assist in Lewis's defense. (DE 126; DE 36). Lewis's standby counsel, Robert Gevers, appeared with Lewis at the evidentiary hearings in this matter.

[2] The transcript from the initial evidentiary hearing on February 9-10, 2016, is filed in the record in two parts, which are consecutively paginated. (DE 136; DE 183). This Report and Recommendation will refer to these transcripts from the initial evidentiary hearing (DE 136; DE 183) as "Initial Tr. __."

[3] The transcript from the supplemental evidentiary hearing on January 27, 2017, is filed in the record, but is not paginated consecutively to the transcripts from the initial evidentiary hearing. (DE 258). Thus, this Report and Recommendation will refer to the transcript from the supplemental evidentiary hearing (DE 258) as "Suppl. Tr. __."

supplemental post-hearing brief (DE 253), to which the government filed a supplemental response (DE 259), and Lewis filed a supplemental reply (DE 260). This matter is now fully briefed.

## I. BACKGROUND

On February 25, 2015, Lewis was indicted on a single-count Indictment for possessing five kilograms or more of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). (DE 13). On February 26, 2015, Lewis entered a plea of not guilty to the single-count Indictment. (DE 17). In April and May 2015, Lewis filed various motions seeking to dismiss the indictment and suppress evidence (DE 29; DE 30; DE 31; DE 33; DE 34), which the Court consolidated together into Lewis's second amended motion to dismiss (DE 33). (DE 56). Thereafter, the consolidated motion was referred by the Court to the undersigned magistrate judge to conduct an evidentiary hearing and issue a report and recommendation. (DE 57). An evidentiary hearing and supplemental evidentiary hearing were held, and various post-hearing briefs were filed by the parties over the course of the more than 20 months since the consolidated motion was referred to the undersigned. (DE 110; DE 111; DE 169; DE 186; DE 189; DE 252; DE 253; DE 259; DE 260). This matter is now fully briefed and ripe for adjudication. After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Lewis's consolidated motion (DE 33) be GRANTED, in that the evidence found in his hotel room and his subsequent statements to police be suppressed; that his motion to quash search warrant (DE 72) be DENIED; and that his second motion to amend hearing issues (DE 85) be DENIED as MOOT.

## II.  FINDINGS OF FACT

At the initial evidentiary hearing on February 9-10, 2016, the government offered the testimony of Officer Brian Harshman, Officer Jason York, Deputy Steven Davis, Sergeant Jay Arnold, Officer Gregory Magee, Officer Adalberto Martinez, and Special Agent James Keszei. (Initial Tr. 3, 150).  The government also submitted 17 exhibits into evidence.  (Initial Tr. 4-5, 151).  Lewis did not testify himself or call any witnesses to testify, but he did submit three exhibits into evidence.  (Initial Tr. 5, 151).  At the supplemental evidentiary hearing on January 27, 2017, Lewis offered the testimony of Thomas Koch, Susan Graff, and Officer Harshman. (Suppl. Tr. 3).  Lewis also submitted two exhibits into evidence.  (Suppl. Tr. 4).  The government called Mark Hess to testify and offered five exhibits into evidence.  (Suppl. Tr. 3-4).  Based on the testimony at the evidentiary hearings and the exhibits admitted into evidence, the facts are as follows:

Brian Harshman ("Harshman") has been employed by the Indiana State Police as a Trooper for approximately 21 years, with 14 years of drug experience.  (Initial Tr. 10-11). Harshman has been assigned as a Task Force Officer to the U.S. Marshals Violent Fugitive Task Force based in the Southern District of Indiana, Indianapolis, for approximately four years. (Initial Tr. 10).  Jason York ("York") is a Greenwood police officer, and he has been employed by the Greenwood Police Department for 10 years.  (Initial Tr. 66).  York has been assigned to the U.S. Marshals Task Force for a little more than four years.  (Initial Tr. 65).  Steven Davis ("Davis") is a Deputy United States Marshal, based out of Indianapolis.  (Initial Tr. 93).  Davis has been with the U.S. Marshals for a little more than five years.  (Initial Tr. 94).  Jay Arnold ("Arnold") has been with the Greenwood Police Department for more than 11 years, and he

became a sergeant in October 2015. (Initial Tr. 120). Arnold has experience in investigations and undercover narcotics. (Initial Tr. 120). Gregory Magee ("Magee") is a Trooper with the Indiana State Police, where he has been employed for 18 years. (Initial Tr. 173). Magee has been a K-9 handler since 2007, and his dog's name is "Camo." (Initial Tr. 174). Adalberto Martinez ("Martinez") has been employed with the Indiana State Police since April 2003. (Initial Tr. 212). He is currently a Detective assigned to the Fort Wayne FBI Safe Streets Task Force. (Initial Tr. 212). Martinez has been assigned to the Safe Streets Task Force since September 2010, and his duties on the Task Force are to investigate large-scale drug conspiracies, gangs, violent crimes, and occasionally bank robberies. (Initial Tr. 212-13). Special Agent James Keszei ("Keszei") has been employed with the FBI for approximately 14 years, and he is also assigned to the Safe Streets Task Force. (Initial Tr. 230). Keszei is usually the case agent on large drug cases, and he has significant experience working on organized crime, large scale drug cases, and working with informants. (Initial Tr. 230-31).

Thomas Koch is a records custodian for Sprint, where he has been employed for approximately 12 and a half years. (Suppl. Tr. 7). As a records custodian, he processes requests served upon Sprint by both law enforcement and private attorneys for customer records, and he also goes to court to explain and authenticate those records. (Suppl. Tr. 7). His job does not require any training or certification. (Suppl. Tr. 7). Susan Graff ("Graff") is a staff operation specialist for the FBI, a position she has held for a little more than two years. (Suppl. Tr. 59). She has been employed by the FBI for a total of 26 years, based out of the Merrillville office. (Suppl. Tr. 59). Mark Hess is employed by the Indianapolis Metropolitan Police Department, where he has worked for 28 years. (Suppl. Tr. 83). He is currently assigned to the U.S. Marshals

Fugitive Task Force, where he has worked for the past 20 years. (Suppl. Tr. 83). His role with the Task Force is to locate people wanted by local law enforcement for warrants, and he specializes in cell phone records. (Suppl. Tr. 83). He has attended many training sessions and courses regarding cell phone usage and analysis. (Suppl. Tr. 84). He conducts training on these areas for other agencies several times per year. (Suppl. Tr. 84).

From 2014 to 2015, the Safe Streets Task Force was investigating a drug conspiracy centered around Allen Bates, who managed to escape being captured by police during a high-speed chase on January 27, 2015, after which Bates fled from Fort Wayne to Mexico. (Initial Tr. 232-33). From his location in Mexico, Bates continued to make contact with a confidential human informant ("the informant"). (Initial Tr. 234). Bates told the informant to meet up with a "Nap or Wayne down in Indianapolis," who would give the informant some cash and help him get a rental car to drive down to Texas, and eventually get into Mexico. (Initial Tr. 235). The informant provided the officers with this information, and officers also got information from text messages on Bates's phone obtained through search warrants. (Initial Tr. 235). The informant provided a 317 area code phone number for "Nap" that he had gotten from Bates. (Initial Tr. 236). The officers submitted the phone number to Graff, who used public databases to determine that the phone number was associated to a Dewayne Lewis. (Initial Tr. 236; Suppl. Tr. 55). Graff then searched for "Dewayne Lewises in Indianapolis, because at that time [the Task Force] didn't know anything about Greenwood, [they] just knew Indianapolis." (Initial Tr. 236-37). Graff "found a likely candidate who had a prior drug history, and generally matched the description provided by the informant." (Initial Tr. 237; *see also* Suppl. Tr. 56). Graff also provided the officers with a photograph of that Dewayne Lewis, which was shown to the

informant, who identified the man in the photograph as "Nap" on January 29, 2015. (Initial Tr. 237; Suppl. Tr. 56).

Keszei had been working with the informant since July 2014, and the informant's tips had been corroborated with audio recordings of meetings with Bates, as well as the seizure of $400,000 cash in a traffic stop in November 2014. (Initial Tr. 239-43). The informant had participated firsthand in the Bates organization's meetings and drug trafficking activities. (Initial Tr. 239-48). The informant had previously been asked to identify an individual who had picked up heroin in October 2014 from two photographs provided by an FBI analyst. (Initial Tr. 241-42). The informant stated that neither of the photographs showed the individual who picked up the heroin. (Initial Tr. 242). The informant had also told the Task Force that "Nap" had shown up to Bates's father's house towards the end of December 2014 in a black Mercedes SUV, when "Nap" gave Bates $125,000 in cash. (Initial Tr. 245). Bates told the informant that "Nap" was a "killer" and was someone who would "ride dirty" with drugs or guns in the car. (Initial Tr. 245).

On January 29, 2015, Harshman was contacted by Martinez, who requested Harshman's assistance in locating a person of interest in a drug case that they were working in Fort Wayne. (Initial Tr. 12). Martinez advised Harshman that they were looking for a man named Dewayne Lewis, who possibly lived in Indianapolis, and who had an active warrant for a probation violation on an original charge of dealing cocaine. (Initial Tr. 12). Martinez informed Harshman that the Safe Streets Task Force was interested in apprehending this Dewayne Lewis on the warrant in order to question him regarding his involvement in an investigation. (Initial Tr. 12). Martinez asked Harshman to locate Lewis, arrest him on his warrant, and then contact Martinez so they could interview him. (Initial Tr. 12). Martinez informed Harshman that Lewis

sometimes utilized a black Mercedes SUV, but Harshman was not given a license plate number or any other identifying information. (Initial Tr. 13). Martinez did provide a telephone number for Lewis to Harshman. (Initial Tr. 14).

On January 30, 2015, Harshman obtained a search warrant for historical data on the telephone number, which would give officers an idea of the area that the device was located in. (Initial Tr. 14). The information that Harshman used to obtain the warrant was only the information that had been provided to him by Martinez and the others in Fort Wayne. (Initial Tr. 14). Harshman obtained the warrant from Judge Richard Hagenmaier in Marion County Court. (Initial Tr. 210). The search warrant was entered into evidence as Government's Exhibit 16. The officers did not receive information from the phone company under the search warrant until February 3, 2015. (Initial Tr. 14).

On the morning of February 3, 2015, Sprint was providing officers with GPS locations for the device, but the data was not precise, as the accuracy levels meant that the "phone could be anywhere in Greenwood or south of or just north of it." (Initial Tr. 16; *see also* Suppl. Tr. 45, 89-90). Basically, officers were "getting a tower location." (Initial Tr. 16). The officers received location information in the morning, after which time the phone was turned off and they did not receive further location information. (Initial Tr. 16).

Harshman testified that he stopped receiving location information for the phone between 10:00 and 11:00 a.m., because the phone was turned off. (Initial Tr. 16, 48, 201). Records from Sprint indicate that Sprint could not locate the phone for a period from 10:34:33 to 14:59:50, likely because the phone was turned off during that time. (Def.'s Ex. 2 at 3-5; Suppl. Tr. 28-29). Sprint obtained location information from the phone until 15:21:51. (Def.'s Ex. 2 at 4-5). After

15:21:51, Sprint was unable to obtain location information from the phone for the remainder of the day. (Def.'s Ex. 2 at 5-6). The times on the Sprint records spreadsheets are Central Standard Time, because Sprint is based in Kansas. (Suppl. Tr. 43). Thus, when these times are translated to Eastern Standard Time ("EST"), the phone was on at 11:34 a.m., when Sprint received location information from the phone; the phone was then likely turned off, as Sprint did not receive location information again until 3:59 p.m. EST, when the phone was back on; Sprint was able to obtain location information from the phone until 4:21 p.m. EST, after which point the phone was likely turned off again, because Sprint was unable to obtain any location information from the phone for the remainder of the day on February 3, 2015. Due to a "bug in the system," the fact that Sprint's records show that it was able to obtain location information from the phone at a certain time does not mean that the location information from that certain time was sent to the officers by Sprint, and Sprint has no way to know whether officers actually received the location information or whether the officers utilized any location information. (Suppl. Tr. 40-41).

Because the officers were only receiving very general location information from Sprint (which information stopped after 10:00 or 11:00 a.m., or at the very latest 11:34 a.m. according to the Sprint records), the officers had to use "regular police work" to try to locate Lewis in the Greenwood area. (Initial Tr. 17). Numerous officers were sent out all over Greenwood to check hotels, apartments, restaurants, bars, shopping center parking lots, or anywhere that someone might stop to meet up with someone else. (Initial Tr. 17-18). The officers were looking for the black Mercedes at these locations. (Initial Tr. 17). After the phone was turned off, the officers did not know when it would be turned back on, and they did not know if the phone was still in

the area.  (Initial Tr. 18).  If the phone did turn back on, the officers did not know if it would be in Kentucky, Fort Wayne, Indianapolis, or still in Greenwood.  (Initial Tr. 18).

Officers were going to hotel offices and talking to the desk clerks, in order to ask them if a Dewayne Lewis had checked in that morning, or if anyone with a black Mercedes had checked in that morning.  (Initial Tr. 20).  York went to the La Quinta Inn, which was across Main Street from the Red Roof Inn, to do the check there.  (Initial Tr. 68-69).  After he had spoken to the management at the La Quinta Inn, York got on his computer in his car to do some research. (Initial Tr. 68-69).  This was after the phone had been turned off and officers were no longer receiving any location information from Sprint.  (Initial Tr. 19, 71).  York used Greenwood's Spillman computer system to see if Greenwood had any "in-house" information about a Dewayne Lewis.  (Initial Tr. 19, 67).  York located a Dewayne Lewis in the database.  (Initial Tr. 19, 67). The date of birth for the Dewayne Lewis located by York was 1974, which did not match the date of birth of 1977 for the Dewayne Lewis that the officers were looking for.  (Initial Tr. 19, 69). However, a black Mercedes SUV was registered to the Dewayne Lewis that York had located. (Initial Tr. 19, 70).  York determined that a white Cadillac Escalade was also registered to the same Dewayne Lewis.  (Initial Tr. 21-22, 70).

Between 2:00 and 3:00 p.m., York advised Harshman that he thought they had "the right name and the right vehicle, but [they were] looking at the wrong person -- the wrong person's picture."  (Initial Tr. 20, 70).  Harshman then contacted Martinez to inform him that they had obtained information regarding a Dewayne Lewis with a different date of birth who drove a vehicle like the one they were looking for.  (Initial Tr. 20).  Martinez told Harshman that it was possible that he had the wrong date of birth, because sometimes the date of birth was incorrect in

the databases. (Initial Tr. 20). Martinez said "one thing he was sure about was the vehicle description." (Initial Tr. 20). York told the other officers via radio to also be on the lookout for a white Cadillac Escalade that might be connected to Dewayne Lewis. (Initial Tr. 72).

After informing Harshman about the Dewayne Lewis he had located in Greenwood's database, York went over to the Red Roof Inn to check with the clerk there, arriving at about 3:00 or 3:30 p.m. (Initial Tr. 20, 68). He spoke to the clerk and learned that a man by the name of Michael Jackson had checked in that morning to Room 211, which he confirmed through the hotel management. (Initial Tr. 68). Deputy U.S. Marshal Steve Davis was sitting on the side of the Red Roof Inn where Room 211 was, in order to watch the room. (Initial Tr. 71-72). Just minutes after York had informed the other officers about the white Escalade, Davis radioed "that a white Cadillac Escalade had just pulled in and there was a black female that got out with a black duffel bag [who] went up to room 211." (Initial Tr. 72). Davis's partner, Lee Markey, provided the plate number for the Escalade to York. (Initial Tr. 112-13). York ran the plate in his computer system, and it came back as registered to the Dewayne Lewis that York had located in the Greenwood Spillman system. (Initial Tr. 72). At that point, York told Harshman that they "needed to be looking for this guy instead of the first." (Initial Tr. 72).

At 3:35 p.m., about 15 to 30 minutes after the woman left the room, York and the other officers performed a "stop and knock," but no one answered the door to Room 211. (Initial Tr. 25, 72-73, 118). Magee brought his K-9, "Camo," to the Red Roof Inn, from the La Quinta Inn. (Initial Tr. 73, 180, 184-85). Magee and Camo "walked up an outside staircase on the south end of the building," to get to the second floor. (Initial Tr. 180). Magee did not need a hotel key to get up to the second floor via the open-air staircase. (Initial Tr. 181; Govt.'s Ex. 1b). Magee and

Camo started at the south end of the building and worked their way down the row of room doors on the second floor of the open-air, exterior hallway. (Initial Tr. 181; Govt.'s Exs. 1c & 1d). Magee gave Camo the command "to seek dope," and then Camo sniffed the outside doors to seven hotel rooms from the public walkway; Camo did not go inside any of the hotel rooms. (Initial Tr. 181). On the door to the seventh room, Camo "immediately turned . . . so fast to come back to that door," that Magee "almost tripped over him." (Initial Tr. 182). Camo went back to that hotel room door, changed his breathing patterns on the seam of the door, and then went to his "final response," which was to sit down and stare at the door. (Initial Tr. 182). Based on his experience and training, Magee knew that this meant that Camo "had located an odor that he was trained to find," one of the six drug odors. (Initial Tr. 182). The room that Camo alerted on was Room 211, and Camo's detection of the odor from that room meant it was likely there were drugs in that room. (Initial Tr. 182).

Officer Dean Wildauer ("Wildauer") typed up a search warrant application to search Room 211. (Initial Tr. 122). Wildauer asked Arnold if he would help get the warrant, since Wildauer did not know the procedures for Johnson County, while Arnold did, since Johnson County was in his jurisdiction. (Initial Tr. 123). Arnold reviewed the search warrant application and then emailed it to the Johnson County deputy prosecutor, Drew Foster ("Foster"). (Initial Tr. 122-25). Foster reviewed the search warrant and then called Arnold and asked him to take it to Judge Lewis Gregory. (Initial Tr. 125). Foster gave Arnold permission to sign his name, as long as Arnold initialed the signature. (Initial Tr. 125). Arnold took the search warrant application before Judge Gregory, and he witnessed the judge sign the warrant. (Initial Tr. 125). The warrant was issued by Judge Gregory at 4:50 p.m. (Initial Tr. 126; Govt.'s Ex. 2). Judge

Gregory also ordered that the warrant remain confidential. (Initial Tr. 127).

The search warrant on Room 211 of the Red Roof Inn was served at 5:05 p.m. (Initial Tr. 27). All of the members of the Fugitive Task Force went up to the room and served the warrant. (Initial Tr. 27). The officers knocked and announced several times, but there was no answer at the door and no noise from inside the room. (Initial Tr. 28). The hotel management had given York a key to the room after they had obtained the search warrant, so York used the key to open the door to the room when no one answered the door. (Initial Tr. 28, 73-74). The officers were only able to open the door a little bit because the security bracket on the inside of the door was engaged, so they had to force the door open. (Initial Tr. 28, 74). After forcing the door open, the officers entered Room 211, and they discovered Dewayne Lewis, the Defendant, inside the room. (Initial Tr. 28, 74). Lewis was the only person found in the hotel room. (Initial Tr. 143). Lewis came out of the bathroom with his hands up, and then he got on the ground as directed by officers. (Initial Tr. 74). Lewis was taken into custody, and York transported him to the Johnson County Jail. (Initial Tr. 74-75).

Inside the room, officers found bags and boxes full of money, as well as stacks of duct-taped packages of cocaine. (Initial Tr. 132; Govt.'s Exs. 3, 6, 7, 8, 9, 11). They field tested at least one of the cocaine packages, which came back positive for cocaine. (Initial Tr. 132-33, 139; Govt.'s Ex. 10). The officers also located duct-taped packages full of money. (Initial Tr. 134; Govt.'s Exs. 4 & 5). The officers found two cell phones on the floor of the room. (Initial Tr. 137; Govt.'s Ex. 8). Boxes of plastic baggies, rubber bands, and rolls of duct tape were also found in the room. (Initial Tr. 141; Govt.'s Exs. 12 & 13). The officers seized 2.8 million dollars from the hotel room, along with 40 kilos of cocaine. (Initial Tr. 206-07).

On February 4, 2015, Keszei and Martinez went to Greenwood in order to interview Lewis. (Initial Tr. 216). The entire interview of Lewis at the Johnson County Jail was video recorded. (Initial Tr. 217; Govt.'s Ex. 15). Keszei read Lewis's *Miranda* rights to him from the Federal Bureau of Investigation Advice of Rights form, and Lewis signed the form. (Initial Tr. 228; Govt.'s Ex. 17). During the interview, Martinez did not notice any signs that Lewis might be intoxicated. (Initial Tr. 218). Lewis informed Martinez that he had a 12th grade education. (Initial Tr. 218). Lewis did not appear to have any issues understanding anything, and he was able to ask intelligent questions and provide intelligent answers. (Initial Tr. 218). During the interview, Lewis provided information pertinent to the case, such as where the drugs came from. (Initial Tr. 219). Lewis also explained that his role was to transport cocaine to Bates's customers and then bring the money back to Bates. (Initial Tr. 222). Lewis identified photographs of some of the people inside the Bates organization, as well as some of Bates's customers. (Initial Tr. 225).

### III. LAW & ANALYSIS

There are currently three pending motions before the undersigned for this Report and Recommendation: (1) the consolidated motion (DE 33); (2) the motion to quash the search warrant (DE 72); and (3) the second motion to amend hearing issues (DE 85). I will address each of these matters in turn.

### A. Lewis's Consolidated Motion

In Lewis's post-hearing briefing in support of his consolidated motion, he makes a variety of arguments for suppression of the evidence against him, which fall into four main categories: (1) challenges to the dog sniff search; (2) challenges to the validity of the warrants in this case;

(3) challenges to the continued use of the trap and trace warrant; and (4) other miscellaneous arguments.[4]

### *1. Lewis's Challenges to the Dog Sniff Search*

Lewis challenges the officers' use of a drug detection dog to sniff the outdoor hallway and the doors to the hotel rooms on the second floor of the Red Roof Inn. Lewis contends that the use of the dog to perform a sniff search was unreasonable. (DE 169 at 8). He argues that in order to conduct the dog sniff search, the officers needed to have reasonable suspicion, probable cause, or a request from hotel management, and Lewis contends that officers had none of these things. (DE 169 at 19-22). Additionally, Lewis argues that a "hotel is a home," and thus the dog sniff was illegal under the Supreme Court's holding in *Florida v. Jardines*, 133 S. Ct. 1409 (2013). (DE 169 at 21-22).

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Subject to a few exceptions, the Fourth Amendment "requires officers to obtain a warrant before searching a home." *United States v. Gutierrez*, 760 F.3d 750, 753 (7th Cir. 2014). The protections of the Fourth Amendment extend to include the home's curtilage, or the area "immediately surrounding and associated with the home." *Jardines*, 133 S. Ct. at 1412 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is

---

[4] Lewis's attempts to dismiss the indictment against him in this case were based on his contentions that jurisdiction and venue were not proper in this Court because his arrest took place in the Southern District of Indiana, while his indictment was brought in the Northern District of Indiana. These matters have previously been resolved by the Court (*see* DE 145), and thus only the matter of suppression of evidence remains before the Court.

infringed, or when the government engages in an unlicensed physical intrusion of a constitutionally protected area in order to obtain information." *Gutierrez*, 760 F.3d at 753-54 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)) (citing *Jardines*, 133 S. Ct. at 1414-15) (internal quotation marks omitted).

The exclusionary rule, "when applicable, forbids the use of improperly obtained evidence at trial and seeks to safeguard Fourth Amendment rights generally through its deterrent effect." *Gutierrez-Berdin v. Holder*, 618 F.3d 647, 653 (7th Cir. 2010) (quoting *Herring v. United States*, 555 U.S. 135, 139-40 (2009)) (internal quotation marks omitted). The exclusionary rule is not necessarily applicable in every case where a Fourth Amendment violation has occurred; this is because the exclusionary rule is "not an individual right," but instead "applies only where it 'results in appreciable deterrence.'" *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009) (quoting *Herring*, 555 U.S. at 141). The Seventh Circuit has explained that courts must weigh the costs of the exclusionary rule against the benefits, writing:

> Application of the exclusionary rule depends on weighing the costs and benefits in each case. Its benefit is deterring police misconduct, *Leon*, 468 U.S. at 916, 104 S. Ct. 3405; but on the cost side of the ledger, "[e]xclusion exacts a heavy toll on both the judicial system and society at large," as it often "suppress[es] the truth" and risks "set[ting] the criminal loose in the community without punishment," *Davis*, 131 S. Ct. at 2427. Thus, exclusion is the option of "last resort," but it tends to be merited when police exhibit "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.* (citations omitted). Exclusion does not apply in several circumstances, including when police conduct a search in objectively reasonable, good-faith reliance on "binding appellate precedent." *Id.* at 2429.

*Gutierrez*, 760 F.3d at 754 (alteration in original).

*a. Whether There Was a Fourth Amendment Rights Violation*

Here, the first question to be addressed is whether Lewis's Fourth Amendment rights were violated by the officers' use of the drug detection dog to sniff the outside of Lewis's hotel room door. "The Fourth Amendment's prohibition against unreasonable searches and unreasonable seizures extends beyond 'the four walls of the home,' to protect the legitimate privacy expectations of the occupant of a hotel or motel." *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir. 1992) (citations omitted). The Supreme Court held in 2013 that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 133 S. Ct. at 1417-18.

In the majority opinion written by Justice Scalia, the holding of *Jardines*—that the warrantless use of a drug detection dog to sniff the door on the defendant's front porch was an unreasonable search in violation of the Fourth Amendment—was based on a property rights analysis. *Id.* at 1417. The majority opinion specifically declined to decide the case based on whether the officers had violated the defendant's expectation of privacy. *Id.* The concurring opinion authored by Justice Kagan suggested that the case could also have been decided on a privacy rights analysis, by recognizing that *Kyllo v. United States*, 533 U.S. 27 (2001), had already resolved the issue.[5] *Jardines*, 133 S. Ct. at 1419 (Kagan, J., concurring). Justice Kagan wrote that *Kyllo* created "both a 'firm' and a 'bright' line at 'the entrance to the house." *Id.* Applying *Kyllo* to the context of a drug dog being used to sniff a home, the concurrence

---

[5] In *Kyllo*, the Supreme Court held that "[w]here . . . the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40.

explained that "[t]he police officers here conducted a search because they used a 'device . . . not in general public use' (a trained drug-detection dog) to 'explore details of the home' (the presence of certain substances) that they would not otherwise have discovered without entering the premises." *Id.*

Since *Jardines* was decided, the Seventh Circuit has applied the majority opinion's property-based approach, noting that the "dispositive question" was "the scope of the implied license," which did not include dog sniffs. *Gutierrez*, 760 F.3d at 756-57 (stating that there is "no question" that officers' use of a narcotics canine to sniff the front door of a home "is no longer permissible, for the officers lacked a warrant (at the time of the sniff) and no exception to the warrant requirement applied"). In a later case, however, the Seventh Circuit adopted the concurring opinion from *Jardines*, and applied *Kyllo*'s privacy rights approach, finding that "[a] trained drug-sniffing dog is a sophisticated sensing device not available to the general public," and stating that the defendant's "lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public." *United States v. Whitaker*, 820 F.3d 849, 852-53 (7th Cir. 2016). The Seventh Circuit accordingly held that "[t]he police engaged in a warrantless search within the meaning of the Fourth Amendment when they had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs." *Id.* at 854.

The government attempts to distinguish the instant case from *Whitaker*, because *Whitaker* involved a "locked internal hallway," while the "outdoor walkway at the Red Roof Inn was in no way restricted and was completely accessible to the public." (DE 186 at 15). The government

17

argues that "[i]t is difficult to understand how the open and outdoor walkway of this hotel is in any way similar to the front porch of a residence or the interior locked hallway of an apartment building." (DE 186 at 15-16). The government also seems to discount the Seventh Circuit's decision to rely on the concurring opinion in *Jardines*, as it "was only endorsed by three justices." (DE 186 at 14). While the government may disagree with the Seventh Circuit's reliance on the concurring opinion from *Jardines* to find that the use of a drug detection dog in the common hallway of an apartment building was a search for purposes of the Fourth Amendment, *Whitaker* is nevertheless binding authority on this Court. The government's arguments that the outdoor walkway at the Red Roof Inn in this case were "in stark contrast to the internal locked hallway in *Whitaker*" (DE 186 at 15) are also unavailing, as the Seventh Circuit's holding in *Whitaker* was based on a privacy interests analysis under *Kyllo*, not on a trespass to property analysis. *Whitaker*, 820 F.3d at 852-53 (finding that "[a] trained drug-sniffing dog is a sophisticated sensing device not available to the general public," and noting that under *Kyllo*, where the government uses such a device "to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant").

Moreover, the Seventh Circuit decided not to distinguish the closed hallway of the apartment building in *Whitaker* from the front porch in *Jardines* specifically because doing so "draws arbitrary lines," and it questioned whether "all multi-unit buildings lack the protection *Jardines* gives to single-family buildings[.]" *Id.* at 854. And given that the decision in *Whitaker* was based on a privacy rights analysis under *Kyllo*, it is clear that the type of hallway or other location from which the dog is used to detect the odor of illegal drugs is not determinative.

Rather, the question is whether officers used a sophisticated sensing device not available to the general public, such as a drug detection dog, to obtain information about the areas of a dwelling for which the occupant does have a reasonable expectation of privacy, when such information would otherwise not be available absent a physical intrusion. In the instant case, officers' use of a drug detection dog to explore details of Lewis's hotel room—which enjoys the same Fourth Amendment protections as a home, *Rosario*, 962 F.2d at 736—that would have been otherwise unknowable absent physical intrusion is a "search" for purposes of the Fourth Amendment, and thus is presumptively unreasonable without a warrant. *See Whitaker*, 820 F.3d at 853.

Thus, for purposes of a Fourth Amendment analysis, the door to a hotel room from an open-air hallway is really no different from the door to an apartment in an enclosed hallway or the door to a detached home. "The dog here detected something (the presence of drugs) that otherwise would have been unknowable without entering the [hotel room]." *Whitaker*, 820 F.3d at 853. I therefore conclude that the use of a drug detection dog to sniff the door of Lewis's hotel room for the scent of illegal drugs was a warrantless search within the meaning of the Fourth Amendment.[6]

---

[6] The government argues that Lewis has not shown that he personally had a privacy right and a reasonable expectation of privacy in the hotel room, since Lewis has not shown that he was an overnight guest in the hotel room that was rented by Michael Jackson. The government argues that "Lewis's mere presence in the room that evening only demonstrated his presence for commercial drug trafficking purposes at best." (DE 186 at 15). Lewis, in his reply brief, responds by stating that he has introduced evidence justifying his reasonable expectation of privacy in the hotel room, but argues in the alternative, that if he has not established such an expectation of privacy, then the "answer is quite simple in this case and that is that the defendant cannot be charged with possession of any allege illegal fruits from Jackson's hotel room 211." (DE 189 at 9-10). The most reasonable inference to be drawn from the evidence in this matter is that Lewis rented the room under an alias, and thus Lewis—who seemingly was in the room from the time it was rented that morning until the time of his arrest later that day—had a reasonable expectation of privacy in the hotel room. There has been no evidence presented to the contrary.

*b. Whether the Search Warrant is Still Supported By Probable Cause*

While the use of the drug dog to sniff Lewis's hotel room door was a warrantless search under the Fourth Amendment, the officers subsequently obtained a search warrant from a judge prior to their search of Lewis's hotel room. The affidavit in support of the search warrant, however, was based at least in part on the drug dog's alert to the presence of narcotics. "[E]vidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information." *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013) (citing *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991)). However, "a search warrant obtained, in part, with evidence which is tainted can still support a search if the 'untainted information, considered by itself, establishes probable cause for the warrant to issue.'" *Id.* (quoting *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005)). To determine "whether the results of the subsequent search must be suppressed, we consider two questions: (1) whether the illegally obtained evidence affected the judge's decision to issue the warrant; and (2) whether the decision to seek the warrant was prompted by information unlawfully obtained." *Id.* (quoting *Gray*, 410 F.3d at 344); *see also United States v. Hobbs*, 509 F.3d 353, 361 (7th Cir. 2007) ("[I]f the judge could have found probable cause for the warrant without the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to seek the search warrant as a result of what they observed during the initial unlawful entry." (citing *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993))).

Here, the factual portion of the affidavit is as follows:

On 2-3-15 ISP officers received information from other law

enforcement officers that a suspected drug trafficker (Dewayne Lewis) was staying at the Red Roof Inn located in Greenwood Indiana. Officers set up surveillance and observed a female who was identified by law enforcement as possibly the wife of Dewayne Lewis arrive at the hotel in a vehicle registered to Dewayne Lewis and enter room 211. She was observed carrying a black gym bag style bag into the room. Officers then observed her exit the room without the bag and leave the property. Dewayne Lewis is suspected in being part of a large scale Cocaine trafficking organization. The hotel room was rented by a Michael Jackson with an address in Evansville, Indiana. Officers attempted a stop and talk room 211, but no one answered the door. ISP Tpr. Greg Magee walked his narcotics K-9 "Camo" along the exterior doors of the hotel which is a common area used by the public to get to different hotel rooms on the second floor. When his K-9 "Camo" came to room 211 the K-9 alerted for the presence of narcotics. K-9 "Camo" was last certified in narcotic detection in September 2014. Based on your affiant's training and experience, a drug detection dog indicating on a door to a hotel room indicates illegal drugs are within the room.

Govt.'s Ex. 2.

Absent the portions of the affidavit related to the drug dog's alert, the affidavit provided only that officers had been told by other law enforcement that a suspected drug trafficker by the name of Dewayne Lewis was staying at the Red Roof Inn in Greenwood, Indiana; that a woman arrived at the hotel in a vehicle registered to Dewayne Lewis; that the woman carried a black gym bag and entered Room 211; that the woman left the hotel without the bag; that Dewayne Lewis was suspected of being part of a large scale cocaine trafficking organization (without any further explanation of that suspicion); that the room had been rented by a Michael Jackson with an address in Evansville, Indiana; and that officers had knocked on the door to the room, but no one had answered the door. These remaining, untainted portions of the affidavit do not provide the necessary probable cause for the warrant to issue; without the information regarding the drug

dog's alert on Room 211, the issuing judge could not have found probable cause for the warrant.

I therefore conclude that the search warrant for Lewis's hotel room was invalid because it was

based primarily on an impermissible drug dog sniff. *See Gutierrez*, 760 F.3d at 752 (noting that

"a warrant based primarily on an impermissible sniff would be invalid").

### c. Whether the Exclusionary Rule Applies

The government argues that, if the Court does find a Fourth Amendment violation, the

exclusionary rule should not apply under the good faith exception articulated in *United States v.*

*Leon*, 468 U.S. 897 (1984). "It is well settled that under *Leon*, the suppression of evidence

seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers

who executed the warrant relied in good faith on the issuing judge's finding of probable cause."

*United States v. Searcy*, 664 F.3d 1119, 1124 (7th Cir. 2011) (citing *Leon*, 468 U.S. at 920-24).

The good faith exception also "applies, among other circumstances, when an officer conducts a

search in reliance on then-binding appellate precedent." *Gutierrez*, 760 F.3d at 753 (citing *Davis*

*v. United States*, 564 U.S. 229, 240 (2011)).

Here, the officers obtained a search warrant from a judge, which authorized them to

search Lewis's hotel room. Even though I found above that the warrant was invalid, the evidence

seized pursuant to the warrant should not be suppressed if the good faith exception to the

exclusionary rule applies. "An officer's decision to obtain a warrant is *prima facie* evidence that

he or she was acting in good faith," and this "presumption of good faith" can only be rebutted if

the defendant shows: "(1) that the issuing judge abandoned his or her detached and neutral role;

(2) the officers were dishonest or reckless in preparing the affidavit; or (3) the warrant was so

lacking in probable cause as to render the officer's belief in its existence entirely unreasonable."

*Searcy*, 664 F.3d at 1124 (citing *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007)). Law enforcement officers are also "charged with a knowledge of well-established legal principles and the corresponding responsibility to learn and follow applicable legal precedent." *Id.* (internal quotation marks omitted) (quoting *United States v. Koerth*, 312 F.3d 862, 869 (2002); *United States v. Mykytiuk*, 402 F.3d 773, 777-78 (7th Cir. 2005)). Under the good faith exception to the exclusionary rule, "the evidence is admissible unless (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand, or (2) the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Id.* (quoting *Koerth*, 312 F.3d at 869).

When applying this test for the good faith exception articulated by the Seventh Circuit in *Searcy* and its predecessors, it appears that the good faith exception *should* apply here, although ultimately it does not. Because Arnold obtained a search warrant for Lewis's hotel room, Lewis must overcome the presumption of good faith. Lewis has not shown that Judge Gregory abandoned his detached and neutral role when issuing the warrant. Lewis has also not shown that the officers were dishonest or reckless in preparing the affidavit. Indeed, the affidavit did not try to hide that officers had used a drug detection dog to sniff the door of the hotel room. There is nothing in the record to show that the officers were anything other than honest and careful in preparing the affidavit for the search warrant. Finally, the warrant itself was not so-lacking in probable cause that it was unreasonable for the officers to believe that probable cause existed. At the time of the dog sniff in this case, officers reasonably relied on the majority

holding in *Jardines*, which held that the use of a drug-detection dog within the curtilage of a home was a search for purposes of the Fourth Amendment, based on a property rights analysis. Judge Gregory, who reviewed the affidavit in support of probable cause for the search warrant, would have reasonably believed that *Jardines* was controlling, and the use of a drug-detection dog was only a search if the dog was used within the curtilage of a home. It was well-settled at the time of the dog sniff in this case that the common areas of multi-unit buildings were not curtilage, and that tenants did not have a reasonable expectation of privacy in such common areas as hallways and basements. *See United States v. Villegas*, 495 F.3d 761, 767-68 (collecting cases); *see also United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997) (holding "that a trained dog's detection of odor in a common corridor [of a hotel] does not contravene the Fourth Amendment," and that "[t]he information developed from such a sniff may properly be used to support a search warrant affidavit").

Furthermore, and as previously discussed,

> Application of the exclusionary rule depends on weighing the costs and benefits in each case. Its benefit is deterring police misconduct, *Leon*, 468 U.S. at 916; but on the cost side of the ledger, "exclusion exacts a heavy toll on both the judicial system and society at large," as it often "suppresses the truth" and risks "setting the criminal loose in the community without punishment," *Davis*, 131 S. Ct. at 2427. Thus, exclusion is the option of "last resort," but it tends to be merited when police exhibit "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.*

*Gutierrez*, 760 F.3d at 754 (internal alteration notation omitted). Suppressing the evidence in this case would have no deterrent effect on police misconduct, because the police in this case did not act with any deliberate, reckless, or grossly negligent disregard for Lewis's Fourth

Amendment rights.

However, this test for the good faith exception to the exclusionary rule is not the last word by the Seventh Circuit. In April 2016—more than a year after the officers in this case used a drug detection dog to sniff the door to Lewis's hotel room—the Seventh Circuit issued *Whitaker*, which, in the undersigned's opinion, significantly altered the landscape for applying the good faith exception to the exclusionary rule in cases where a drug detection dog is used to sniff the door to a dwelling. In *Whitaker*, the Seventh Circuit found that the good faith exception did not apply to officers' post-*Jardines* use of a drug-detection dog to sniff the defendant's apartment door in January 2014, stating:

> At the time of this search, there was no recognized expectation of privacy in the common areas of a multi-unit apartment building. *See United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001) (holding "tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings"); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding "tenant has no reasonable expectation of privacy in the common areas of an apartment building"); *Harney v. City of Chicago*, 702 F.3d 916 (7th Cir.2012) ("Absent certain particular facts not alleged here, there is no reasonable expectation of privacy in common areas of multiple dwelling buildings."). However, no appellate decision specifically authorizes the use of a super-sensitive instrument, a drug-detecting dog, by the police outside an apartment door to investigate the inside of the apartment without a warrant. Therefore, the officer could not reasonably rely on binding appellate precedent, and the good-faith exception does not apply.
>
> Moreover, *Kyllo* was decided before the search of Whitaker's apartment. The logic of *Kyllo* should have reasonably indicated by the time of this search that a warrantless dog sniff at an apartment door would ordinarily amount to an unreasonable search in violation of the Fourth Amendment.

*Whitaker*, 820 F.3d at 854-55. While *Whitaker* was not decided until after the search in this case,

the Seventh Circuit foreclosed application of the good faith exception to the exclusionary rule in cases such as this one; the Seventh Circuit made clear that in searches taking place after *Kyllo* was decided, "the logic of *Kyllo* should have reasonably indicated by the time of this search that a warrantless dog sniff at an apartment door would ordinarily amount to an unreasonable search in violation of the Fourth Amendment." *Id.* at 855. Because a hotel room is entitled to the same Fourth Amendment protections from warrantless searches as a home, *Rosario*, 962 F.2d at 736, the "logic of *Kyllo*" would also "have reasonably indicated that the warrantless dog sniff at [a hotel room] door would ordinarily amount to an unreasonable search in violation of the Fourth Amendment." *See Whitaker*, 820 F.3d at 855. Because the Seventh Circuit foreclosed the application of the good faith exception to drug dog sniffs at dwelling doors post *Kyllo*, I have no option but to find that the good faith exception to the exclusionary rule does not apply in this case.

### d. Conclusion

To summarize, the use of the drug detection dog to sniff the door to Lewis's hotel room was a warrantless search, pursuant to *Whitaker*. Without the information obtained via the unlawful dog sniff search, the warrant issued to search the hotel room lacked probable cause and was therefore invalid. Finally, the good faith exception to the exclusionary rule does not apply, because "the logic of *Kyllo* should have reasonably indicated by the time of this search that a warrantless dog sniff at [a hotel room] door would ordinarily amount to an unreasonable search in violation of the Fourth Amendment," *Whitaker*, 820 F.3d at 855. For these reasons, I conclude that the search of Lewis's hotel room was performed pursuant to an invalid warrant, and was therefore an illegal search in violation of his Fourth Amendment rights. As a result, it is

my recommendation that Lewis's consolidated motion (DE 33) be granted, such that all evidence obtained during the search of the hotel room, and all "fruit of the poisonous tree" (including Lewis's statements made during his post-arrest interview) should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

### 2. Lewis's Remaining Arguments

In his post-hearing briefs in support of his consolidated motion, Lewis makes other arguments in support of his contention that the evidence against him should be suppressed. However, because I already found above that the evidence against Lewis obtained during and subsequent to the search of his hotel room must be suppressed, I need not address Lewis's remaining arguments.

### B.  Lewis's Motion to Quash Search Warrant

In his "Motion to Quash Search Warrant" (DE 72), Lewis requests that the Court quash the search warrant issued by the Greenwood City Court that authorized police to search his hotel room at the Red Roof Inn, because he contends that the warrant "relied upon deliberate, reckless and misleading information in the probable cause affidavit."  (DE 72 at 1).  Lewis also contends that the case number under which the search warrant was filed in Greenwood City Court may not exist, because the Greenwood City Court Clerk's Office and the Johnson County Prosecutor's Office informed Lewis "that they have no documentation in their files attached to case number 41H02-1502-MC5."  (DE 72 at 3).

At the evidentiary hearing, evidence was introduced showing that the search warrant was properly obtained from a judge in Greenwood City Court, and that the warrant was ordered to be kept confidential.  (Initial Tr. 122-27; *see also* Govt.'s Ex. 2).  There is no evidence to support

Lewis's contention that this case number does not exist; rather, the records likely remained under the confidentiality order at the time Lewis requested them from the Greenwood City Court Clerk. In his post-hearing briefing, Lewis also appears to have abandoned his arguments that the search warrant should be quashed. As a result, I will recommend that Lewis's motion to quash the search warrant (DE 72) be denied.

### C. Lewis's Second Motion to Amend Hearing Issues

In his second motion to amend the hearing issues, Lewis sought to include, as an issue at the evidentiary hearing, whether officers continued to use the trap and trace warrant to obtain location information after they learned that a material fact that established the probable cause underlying the warrant was incorrect. (DE 85). Lewis was permitted to address this issue at the evidentiary hearings, and Lewis included arguments on this issue in his post-hearing briefing. As a result, Lewis has already been granted the relief he requested in his second motion to amend the hearing issues. I will therefore recommend that the Court deny this motion as moot.

### IV. CONCLUSION

For the above reasons, I CONCLUDE that Lewis's Fourth Amendment rights were violated when officers, without a warrant, used a drug detection dog to sniff the door to Lewis's hotel room for the scent of narcotics within the room. I CONCLUDE that the search warrant for Lewis's hotel room lacked probable cause without the information obtained via the impermissible sniff, and thus the search warrant was invalid. I further CONCLUDE that the good faith exception to the exclusionary rule does not apply, and I therefore RECOMMEND that Lewis's consolidated motion (DE 33) be GRANTED, in that all evidence resulting from the illegal drug dog sniff and subsequent search of the hotel room pursuant to the invalid warrant be

suppressed.  I further RECOMMEND that Lewis's motion to quash the search warrant (DE 72) be DENIED and that Lewis's second motion to amend hearing issues (DE 85) be DENIED as MOOT.

The Clerk is directed to send a copy of this Report and Recommendation to Lewis and the Government.  NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations.  Fed. R. Crim. P. 59(b)(2).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 24th day of May 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge