# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:15-CR-10-TLS |
| | ) | |
| DEWAYNE LEWIS | ) | |

## OPINION AND ORDER

By way of Indictment, Defendant Dewayne Lewis is charged with knowingly and intentionally possessing with intent to distribute five kilograms or more of cocaine, a violation of 21 U.S.C. § 841(a)(1). In April and May 2015, the Defendant, proceeding pro se, filed various motions seeking to dismiss the indictment and suppress evidence, which this Court consolidated and referred to Magistrate Judge Susan Collins to conduct an evidentiary hearing and issue a report and recommendation. After numerous motions, hearings, and briefs, on May 24, 2017, the Magistrate Judge issued a Report and Recommendation [ECF No. 265], recommending that the Defendant's consolidated Motion [ECF No. 33] be granted. Specifically, the Magistrate Judge recommended that the evidence found in his hotel room and his subsequent statements to police be suppressed. Accordingly, the Magistrate Judge recommended that the Defendant's Motion to Quash Search Warrant [ECF No. 72] be denied, and that his second Motion to Amend Hearing Issues [ECF No. 85] be denied as moot because he already received the requested relief. On May 31, 2017, the Defendant filed a Notice [ECF No. 266] to express his agreement with the Magistrate Judge's recommendation, ask that the Court accept the Report and Recommendation, and request that the Court dismiss the Indictment against him. On June 6, 2017, the Government filed its Objections to Magistrate's Report and Recommendation [ECF No. 267]. On June 13, 2017, the Defendant filed his Response to Government's Objection Regarding Report and

Recommendation [ECF No. 268].

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(A)–(B), a magistrate judge does not have authority to issue a final order on a motion to suppress evidence in a criminal case. Instead, the magistrate judge submits proposed findings of fact and recommendations to the district court. If a party files a timely objection to the magistrate judge's report and recommendation, § 636(b)(1) provides that

> the district judge is to make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The court may accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge also may receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* Fed. R. Civ. P. 72(b)(3). Portions of a recommendation to which no party objects are reviewed for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

The Government objects to the Magistrate Judge's finding that a dog sniff conducted outside a motel room violates the Fourth Amendment rights of a person staying inside the room. Further, the Government argues that the Court need not reach the Fourth Amendment issue because, even if the search was illegal, the exclusionary rule does not apply to the circumstances of this case. Any one of three independent reasons, according to the Government, counsels against exclusion of the cocaine and money found in the hotel room that the Defendant was occupying on February 3, 2015: (1) the Defendant did not have standing to challenge to the search; (2) the evidence sought to be suppressed would have inevitably been discovered through lawful means, and; (3) the officers conducting the dog sniff acted in good faith reliance on the controlling precedents at the time.

2

De novo review does not require a de novo evidentiary hearing. *See United States v. Raddatz*, 447 U.S. 667, 673–76 (1980). Neither party has requested a hearing, or made any challenges that would render a hearing necessary, and the Court finds that the record before the Magistrate Judge is sufficient to allow this Court to make a de novo determination.

## FACTS AND BACKGROUND

The Magistrate Judge's findings of fact are based on the testimony of Officer Brian Harshman, Officer Jason York, Deputy Steven Davis, Sergeant Jay Arnold, Officer Gregory Magee, Officer Adalberto Martinez, Special Agent James Keszei, Thomas Koch, Susan Graff, and Mark Hess, and upon the exhibits admitted into evidence. The parties do not dispute the Magistrate Judge's findings of fact, and the Court adopts them in their entirety. For ease of reference, the relevant facts are set forth below, with additional details provided in the analysis section of this Opinion and Order as necessary.

From 2014 to 2015, an FBI task force, referred to as the Safe Streets Task Force, was investigating a large scale drug conspiracy that centered around Allen Bates. On January 27, 2015, the task force served numerous warrants in Indiana, Ohio, and Texas. Bates, however, evaded arrest and fled to Mexico. Agent James Kezei began focusing his investigative efforts on locating Bates, including obtaining search warrants for text messages on telephones that Bates was using from his location in Mexico to coordinate events in Fort Wayne. One person who Bates continued to communicate with through text messages was a confidential informant who was closely associated with Bates. The informant had been cooperating with the Government for over six months, and had provided numerous details about the drug organization.

According to the text messages, Bates wanted the confidential informant to come to McAllen, Texas, where Bates would help him cross the Mexican border. Bates told the informant that a man in Indianapolis known as "Nap" or "Wayne" could help by getting the informant cash and a rental car. The informant was aware of Nap, having previously told investigators about meeting him in December 2014 at the residence of Bates's father. The informant had reported that Nap arrived at the house in a black Mercedes SUV and gave Bates about $125,000. Bates also told the informant that Nap was "a killer" who would "ride dirty," which meant that he was not afraid to carry firearms and drugs. (Tr. 214, ECF No. 183 at 67; Tr. 245, ECF No. 183 at 98.)

On January 29, 2015, Bates gave the informant 317-507-8010 as the telephone number to contact Nap. An FBI analyst determined that the phone number belonged to a person named Dewayne Lewis. The investigation, as well as the area code of the target phone number, suggested that the Dewayne Lewis they were looking for had ties to Indianapolis. The pre-paid phone had no billing address, but the analyst searched the Indianapolis 317 area code and found a person named Dewayne Lewis born in 1977 with a prior drug-related conviction. He was wanted on an outstanding probation violation warrant. The FBI agents showed a picture of this Dewayne Lewis to the informant, who identified the person in the photograph as Nap. The informant turned out to be mistaken about the photograph identification. The 317-507-8010 number was actually assigned to a different Dewayne Lewis with a birth year of 1974—the Defendant in this case.

FBI agents passed the information about the Indianapolis Dewayne Lewis to the United States Marshal's Violent Fugitive Task Force in Indianapolis. On January 30, 2015, FBI Task Force Officer Brian Harshman obtained a search warrant to track the location of the 317-507-

8010 phone on grounds that it would help investigators locate Dewayne Lewis, who had become

a suspect in the drug conspiracy. Investigators hoped to arrest Lewis on the warrant and then

interview him about his involvement in the drug conspiracy. In accordance with the warrant,

Sprint began providing location information to investigators on February 3, 2015. They learned

that the phone was, in essence, located within a 2/3 mile radius of a cell tower located in

Greenwood, Indiana, which is a southern suburb of Indianapolis. After 11:34 a.m., the phone

was no longer capable of being traced, likely meaning that it was powered off or connected to a

Wi-Fi network. For the locate to work, the telephone had to be powered up and on the Sprint

network at the precise snapshot in time of the locate effort, which was typically done in

15-minute intervals.

Knowing only the general location of the phone, eight to ten Marshals from the Task

Force spread out across Greenwood attempting to locate Dewayne Lewis. They searched the

parking lots of hotels, apartments, restaurants, bars, and shopping centers for a black Mercedes

SUV. They asked hotel desk clerks if a Dewayne Lewis or black male driving a black Mercedes

had recently checked in. Task Force Officer Jason York took the initiative to run Dewayne

Lewis's name through the local police database, and he discovered that a Dewayne Lewis born

in 1974 lived in Greenwood. The two cars registered to him were a black Mercedes and a white

Cadillac Escalade.

Based on the discrepancy between the 1977 birth date for the Indianapolis Dewayne

Lewis that Officer Harshman had been tasked to locate, and the 1974 birth date for the

Greenwood Dewayne Lewis, at around 2:30 p.m., Officer Harshman emailed Fort Wayne FBI

Task Force Officer Adalberto Martinez a BMV photograph of Lewis and asked if he was the

person the FBI was trying to find. Officer Harshman relayed that they had obtained information regarding a Dewayne Lewis with a different date of birth who drove a vehicle like the one investigators were looking for. Martinez relayed that the date of birth could have been reported incorrectly in the database, but he was certain about the vehicle description. Therefore, the FBI asked the Marshals to locate the Greenwood Lewis. Officers were also alerted to be looking for a white Cadillac Escalade.

Officer York learned that a black male who identified himself as Michael Jackson from Evansville had, around 10:00 o'clock that morning, checked into Room 211 of the Greenwood Red Roof Inn. Shortly thereafter, a Deputy Marshal who was conducting surveillance at the Red Roof Inn saw a woman, who resembled the BMV photograph of the Greenwood Lewis's wife, arrive in a white Cadillac Escalade. She carried a medium-sized duffle bag to Room 211, looked around for a bit, and then entered the room. The woman stayed in the room for less than five minutes. When she left, she was no longer carrying the bag. Officer York confirmed through records that the license plate on the Cadillac was registered to the Dewayne Lewis that Officer York had located in the Greenwood database. Less than twenty minutes later, officers knocked on the door to Room 211, but they received no answer.

Officers then walked a trained drug detection dog up the exterior staircase of the motel to the second floor, and along the open air walkway that ran the length of the hotel for access to the guest rooms. The dog alerted outside of Room 211. A Greenwood sergeant applied for, and obtained, a search warrant for Room 211. Officers executed the warrant at 5:05 p.m. Inside Room 211, officers found the Defendant, over $2 million cash, and 40 kilograms of cocaine.

In a recorded interview the following day, the Defendant confessed that he was running

drugs for Bates and that the cocaine in the hotel room had previously been stored by the Bates

organization in Butler, Indiana. The drugs had been missed by the January 27 search warrants.


**ANALYSIS**

A.      **The Dog Sniff Did Not Violate the Defendant's Fourth Amendment Rights**

The Fourth Amendment to the United States Constitution guarantees "the right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures." U.S. Const. Amend. IV. The text of the Fourth Amendment "indicates with some

precision the places and things encompassed by its protections: persons, houses, papers, and

effects." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (citation and quotation marks

omitted); *see also United States v. Jones*, 565 U.S. 400, 406 (2012) (noting that the Fourth

Amendment expresses "a particular concern for government trespass upon the areas ('persons,

houses, papers, and effects') it enumerates"). Under Fourth Amendment jurisprudence, a search

occurs either when the government physically intrudes without consent upon "a constitutionally

protected area in order to obtain information," *Jones*, 565 U.S. at 407 (quoting *United States v.*

*Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)), or "when an expectation of privacy

that society is prepared to consider reasonable is infringed," *United States v. Karo*, 468 U.S. 705,

712 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

As the Seventh Circuit has noted, the Supreme Court has in recent years "revived a

'property-based approach' to identifying unconstitutional searches." *United States v. Sweeney*,

821 F.3d 893 (7th Cir. 2016). For example, in *Jones*, the Court found that attaching a GPS

tracker to a vehicle was a physical occupation of "private property for the purpose of obtaining

information," and the intrusion is a search subject to the Fourth Amendment. 565 U.S. at 404. The Court emphasized that "[t]he text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous." *Id.* at 405.

In *Jardines*, the Supreme Court, relying on a traditional property rights understanding of the Fourth Amendment, held that it is unconstitutional to enter the curtilage of a home for the purpose of using a trained police dog to investigate the home and its immediate surroundings. 133 S. Ct. at 1416 (2013). The Court emphasized the home as "first among equals" when it comes to the Fourth Amendment. *Id.* at 1414. Because "the officers' investigation took place in a constitutionally protected area," the Court turned its attention to whether is was accomplished "through an unlicensed physical intrusion." *Id.* at 1415. The Court determined that the implied license that officers had to enter the defendant's porch depended on the purpose for which they entered. *Id.* at 1417. Because entering the constitutionally protected area—the porch—was done with a purpose to conduct a search, it exceeded the scope of the implicit license and was unconstitutional. *Id.* at 1416–17.

*Jardines* took issue with the officers' investigative purpose, not their instrument of choice. *See id.* at 1417 (stating that "when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant"). In fact, the Court declined to consider whether the officer's investigation with the drug sniffing dog violated the defendant's "reasonable expectation of privacy" under cases applying that test because the fact that the officers "learned what they learned only by physically

intruding on [the defendant's] property to gather evidence [was] enough to establish that a search occurred." *Id.* Although property rights "are not the sole measure of Fourth Amendment violations," *id.* at 1414 (quoting *Soldal v. Cook Cty.*, 506 U.S. 56, 64 (1992), as demonstrated by *Katz v. United States*, 389 U.S. 347 (1967), and its progeny, the other measurements "do not subtract anything from the Amendment's protections 'when the Government *does* engage in a physical intrusion of a constitutionally protected area,'" *id.* (quoting *Knotts*, 460 U.S. at 286 (Brennan, J. concurring) (brackets omitted)); *see also id.* at 1417 (noting that the *Katz* reasonable expectation test was an addition to the property-based understanding of the Fourth Amendment that "is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas").

The *Katz* decision was a deviation from the property-based approach. The government had placed an electronic listening device on the outside of a public phone booth. 389 U.S. at 348. The Court held that the government had violated the Fourth Amendment because Katz had "justifiably relied" on the privacy of the phone booth when using it. *Id.* at 353. Later cases applied the analysis of Justice Harlan's concurrence in that case, which said that a Fourth Amendment violation occurs when government officers violate a person's "reasonable expectation of privacy." *See, e.g.*, *Bond v. United States*, 529 U.S. 334 (2000); *California v. Ciraolo*, 476 U.S. 207 (1986); *Smith v. Maryland*, 442 U.S. 735 (1979).

*Kyllo v. United States*, 533 U.S. 27 (2001), is another case that was decided using the expectation of privacy rubric. In *Kyllo*, the police used thermal imaging to determine the amount of heat emanating from the defendant's home. 533 U.S. at 29. The Court recognized that the right to be free from governmental intrusion was at the core of the Fourth Amendment, but

wrestled with whether examining the portion of a house that is in plain view was an unreasonable search when there was no trespass. *Id.* at 31–32. The Court concluded "that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where . . . the technology in question is not in general public use." *Id.* at 34 (internal quotation marks and citation omitted).

Recently, in *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016), the Seventh Circuit was faced with deciding whether using a trained narcotics dog in a hallway outside an apartment for purposes of gathering incriminating evidence was a search of the home within the meaning of the Fourth Amendment. The court cited to *Jardines*, but did not rely on the trespass to curtilage reasoning. Rather than apply the *Jardines* majority's property-based rationale, the court introduced Justice Kagan's concurrence, in which she had noted that while the "Court today treats this case under a property rubric," she "could just as happily have decided it by looking to Jardines' privacy interests," *Jardines*, 133 S. Ct. 1409, 1418 (Kagan, J. concurring). *Id.* at 852 ("The use of a drug-sniffing dog here clearly invaded reasonable privacy expectations, as explained in Justice Kagan's concurring opinion in *Jardines*."). Justice Kagan's approach viewed *Jardines* through the privacy lens of *Kyllo* because the search used a super-sensitive device to garner private details from the interior of the home. *Id.* at 853. The court adopted that framework, holding that, like the search of Jardines's porch, "[a] dog search conducted from an apartment hallway comes within [*Kyllo*]'s ambit." *Id.* ("A trained drug-sniffing dog is a sophisticated sensing device not available to the general public. The dog here detected something (the presence of drugs) that otherwise would have been unknowable without entering the

apartment.").

The court also wrote that "the fact that this was a search of a home distinguishes this case from dog sniffs in public places" *id.* at 853 (citing *United States v. Place*, 462 U.S. 696, 698 (983) (luggage at airport), and *Illinois v. Caballes*, 543 U.S. 405, 406 (2005) (traffic stop)), because "[n]either case implicated the Fourth Amendment's core concern of protecting the privacy of the home," *id.* Moreover, the Court thought that "[t]he practical effects of *Jardines* also weigh in favor of applying its holding to dog sniffs at doors in closed apartment hallways." *Id.* at 854 (stating that "[d]istinguishing *Jardines* based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines"). The court thought that "a strict apartment versus single-family house distinction" would be "troubling because it would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity." *Id.*

This Court cannot properly interpret *Whitaker* and determine its applicability to the dog sniff conducted at the hotel without taking note of the other cases that still control the legal landscape. For example, when applying *Whitaker*, the Court cannot ignore that the Supreme Court has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device. *See Caballes*, 543 U.S. at 409–410 (distinguishing *Kyllo*).

In *Caballes*, the Supreme Court held that a use of a drug dog during a lawful traffic stop does not implicate legitimate privacy interests. 543 U.S. at 409. There was no "legitimate" privacy interest because "governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" *Caballes*, 543 U.S. at 408 (quoting *Jacobsen*, 466 U.S. at 123). "This is because the expectation 'that certain facts will not come to the attention of

the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" *Id.* at 408–09 (quoting *Jacobsen*, 466 U.S. at 122). The Court recognized that canine sniffs are not designed to disclose any information other than the presence or absence of narcotics. *Id.* at 409.

It was important to the holding in *Caballes* that the defendant was already lawfully seized for a traffic violation when the dog was employed. Additionally, the Court held that its decision was entirely consistent with the holding in *Kyllo* because "[c]ritical to that decision was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.'" *Id.* at 409–10 (quoting *Kyllo*, 533 U.S. at 38). Indeed, the *Kyllo* Court's expressed concern was with leaving homeowners "at the mercy of advancing technology" including technology "that could discern all human activity in the home." *Kyllo*, 533 U.S. at 35 (explaining why the distinction between "off-the-wall" and "through-the wall" information was not a valid distinction for Fourth Amendment purposes). In contrast, the use of a drug-detecting canine does not reveal the details of any lawful activity, which prompted the *Caballes* Court to note:

> The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

*Id.* at 410.

*Jardines* did not purport to overrule *Caballes* and the well-settled proposition that a dog sniff is not a Fourth Amendment search if it is conducted by law enforcement from an area they have a legal right to be. Neither has any other Supreme Court decision. As the dissent in

*Jardines* pointed out, had the majority used a *Kyllo*-based approach, instead of a property-based one, the holding "would have [had a] much wider reach." 133 S. Ct. at 1426 (Alito, J. dissenting).

> When the police used the thermal imaging device in *Kyllo*, they were on a public street, 533 U.S., at 29, 121 S. Ct. 2038, and "committed no trespass." *Ante*, at 1419. Therefore, if a dog's nose is just like a thermal imaging device for Fourth Amendment purposes, a search would occur if a dog alerted while on a public sidewalk or in the corridor of an apartment building. And the same would be true if the dog was trained to sniff, not for marijuana, but for more dangerous quarry, such as explosives or for a violent fugitive or kidnapped child. I see no ground for hampering legitimate law enforcement in this way.

(*Id.*) Although *Whitaker* did use a *Kyllo*-based approach, it was nonetheless restrained by the location of the dog sniff and its implication for "the Fourth Amendment's core concern of protecting the privacy of the home," whether it be an apartment or a single-family home. *Whitaker*, 820 F.3d at 853. Read in its entirety, and in conjunction with binding Supreme Court precedent, *Whitaker* appears to adopt a hybrid approach for dog sniff cases in the Seventh Circuit.[1]

What distinguishes *Whitaker* from *Caballes* is not the type of investigation at issue—both involved a drug detecting dog. Therefore, the distinction must lie in the place where the investigation took place, and whether the police had a lawful right to be there. The Seventh Circuit recognized as much in *United States v. Gutierrez*, 760 F.3d 752 (7th Cir. 2014). The court adopted the *Jardines* majority's reasoning that "the use of a drug dog on the defendant's

---

[1] Ruling on the basis of *Kyllo* alone would have put the Seventh Circuit in the position of overruling *Caballes*, which of course it cannot do. *Cf. Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

porch was a Fourth Amendment search . . . based on an implied license theory," but noted that, even after *Jardines*, police officers do not need a warrant to use dog sniffs or to enter the curtilage to seek information "so long as they are done separately." *Id.* at 756. Here, the police were not in an area where their presence— regardless of their purpose— could be considered trespass. Rather, as in *Caballes*, they were lawfully present when the dog sniff occurred.

When the police traversed the hotel walkway, they were not physically intruding on a "constitutionally protected area." *Jardines*, 133 S. Ct. at 1415. "To establish a Fourth Amendment violation under [the property-based] approach, there must be some trespass upon one of the protected properties enumerated by the Constitution's text." *Sweeney*, 821 F.3d at 899. "[T]o prove a claim of trespass, one must have possession of the property in question and the ability to exclude others from entrance onto or interference with that property." *Id.* at 900. Just as the defendant in *Sweeney* could not show any trespass on his property when officers accessed the crawl space under the basement stairs of an apartment building, the Defendant here cannot show that the officer's presence on the hotel walkway was a trespass on his property. Rather, "any trespass would be a trespass against the building owner, not against the individual" hotel occupants. *See id.* (noting that it is the landlords of apartments who can sue for trespass to common areas of multi-unit dwellings and, thus, object to warrantless searches of common areas).

Neither was the walkway within the Defendant's constitutionally protected area under a traditional curtilage analysis. Whether a particular place is within the curtilage of a residence may be "determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294,

14

300 (1987). The Supreme Court identified four such factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301. These factors are not a mechanistic formula but are "useful analytical tools" so long as they "bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Here, the conduct occurred in an unenclosed, common area that was readily accessible to the public at all hours. The external walkway was shared with anyone who reserved a room on the second floor, anyone visiting to the occupiers of those rooms, housekeeping staff, hotel management, and maintenance crews. No key was required to access the area, and it was fully visible to anyone who might walk by, even from the adjacent parking lot. The officers did not pass through any locked exterior entrances or any locked interior doorways before reaching the second-floor hallway with the canine. As a guest who registered with the hotel that morning, the Defendant did not obtain either a property interest in any of the areas outside the rented room or a right to exclude others from those areas or to protect it from observation. Based on these factors, and the absence of any case to the contrary, the Court finds that the hallway of the Red Roof Inn was not within the curtilage of the hotel room.

Because the officers did not physically intrude a protected area, their use of the drug dog could only implicate the Defendant's Fourth Amendment rights if the Defendant had a legitimate expectation of privacy in the detection of unlawful contraband in his hotel room. Although the

Fourth Amendment's protections against unreasonable searches and seizures extends "to protect the *legitimate* privacy expectations of the occupant of a hotel or motel," *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir. 1992) (emphasis added), the Court finds that the use of a trained drug dog outside the hotel room implicated only the Defendant's hope that contraband would not be detected. It did not implicate any legitimate expectation "that information about perfectly lawful activity will remain private." *Caballes*, 543 U.S. at 410; *see also United States v. Place*, 462 U.S. 696, 707 (1983) (finding that canine sniff of luggage was not a search and noting "limited" nature of the investigative procedure "both in the manner in which the information is obtained and in the content of the information revealed by the procedure"). Because the drug-detecting dog could not reveal any information other than the likely presence of illegal narcotics, it did not compromise an expectation of privacy that society is prepared to consider reasonable.

In the end, this case is far removed from the circumstances presented in *Jardines*. The Supreme Court in *Jardines* concluded that a dog sniff became a search due to the physical intrusion onto the defendant's constitutionally protected property. 133 S. Ct. at 1417–18. No such intrusion occurred here. The officers, and the drug detection dog, were in a place in which they had a lawful right to be. Ultimately, even the result in *Whitaker* relied heavily on the fact that it involved "a search of a home," 820 F.3d at 853, thus distinguishing its holding from *Caballes*. There being no alignment with the facts in *Jardines* or *Whitaker* with respect to the location where the police led the dog to perform a sniff, the Court finds that this case turns on *Caballes*. The sniff was not capable of revealing any "information other than the location of a substance that no individual has any right to possess." *Caballes*, 543 U.S. at 410. Accordingly,

16

the Defendant's expectations about perfectly lawful activity—which would have been legitimate and protected—were not implicated. The Defendant, undoubtedly, desired that his illegal activity inside the hotel room remain private. But "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States*, 466 U.S. 170, 182–83 (1984) (footnote omitted).

**B.      The Exclusionary Rule**

Even if the use of the drug dog was an illegal search, exclusion of the evidence is not automatic. Evidence that is obtained through illegal means is not admissible when the exclusion of the evidence is "needed to deter police from violations of constitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442–43 (1984). Although the exclusion of evidence may result in "letting persons obviously guilty go unpunished for their crimes," the Supreme Court has accepted this "high social cost" as a "way to ensure" that police are deterred from committing violations of constitutional rights. *Id.* at 443. Accordingly, the exclusionary rule should not be imposed where the challenged evidence "has been discovered by means wholly independent of any constitutional violation" because the "exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.*; *see also Murray v. United States*, 487 U.S. 533, 537 (1988). "The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or

misconduct had occurred." *Nix*, 467 U.S. at 443.

The Government concedes that the independent source doctrine is not applicable to the circumstances of this case. (Govt's Obj. 7 n.1, ECF No. 267.) However, it argues that the Magistrate Judge's Report and Recommendation does not account for the inevitable discovery of the evidence from the hotel room. The Supreme Court, in *Nix v. Williams*, recognized an inevitable discovery exception to the exclusionary rule, reasoning that the "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial," 467 U.S. at 446, but would instead "inflict a wholly unacceptable burden on the administration of criminal justice," *id.* at 447. Therefore, when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Id.* at 448.

"The inevitable discovery doctrine applies where evidence is not actually discovered by lawful means, but inevitably would have been. Its focus is on what would have happened if the illegal search had not aborted the lawful method of discovery." *United States v. Markling*, 7 F.3d 1309, 1318 n.1 (7th Cir. 1993) (explaining that the inevitably discovery doctrine differs from the independent source doctrine, because the latter focuses on what "actually happened" instead of what "would have happened"); *see also Murray*, 487 U.S. at 539 (explaining that the inevitable discovery doctrine, "is in reality an extrapolation from the independent source doctrine: *Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered*"). The government meets its burden to establish that evidence would have inevitably been discovered by lawful means when

it shows two things: (1) "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;" and (2) "that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009); *see also United States v. Jones*, No. 16-4254, 2017 WL 2791081, at *4 (7th Cir. June 28, 2017, as amended June 30, 2017).

The Government has satisfied its burden. Had the police complied with the Fourth Amendment in every way, the consequences for the Defendant would have been the same. At the time the drug dog was used, the officers had strong evidence that a man nicknamed Nap or Wayne was part of the Bates drug conspiracy. The confidential informant had witnessed Nap deliver money to Bates just over a month prior. The confidential informant had received text messages from Bates, advising that this individual could help the confidential informant get to Texas. This suggested that Nap was still in communication with, and helping, Bates.

The investigators also had a phone number for Nap, which was registered to a person named Dewayne Lewis. The confidential informant had also provided a description of the vehicle Nap drove when he delivered money to Bates. The phone number is what eventually led investigators to Greenwood, Indiana. They also learned that a black man matching the general description provided by the confidential informant had checked into Room 211 of the Greenwood Red Room Inn at 10:10 a.m., around the same time that the phone ceased being capable of tracing. Investigators had discovered that a Dewayne Lewis who lived in Greenwood had a registered vehicle that matched the informant's description of a black Mercedes. He also had a second vehicle, a white Cadillac Escalade. As they were watching the hotel, a woman matching the description of Lewis's wife arrived at the hotel, looked around to see if she was

being watched, delivered a duffel bag, and left. She was driving the white Cadillac registered to the Greenwood Lewis. Accordingly, the police had ample facts upon which to base their belief that the person in the hotel room was connected to the phone that had been in Greenwood earlier that day, that the person was helping Bates, that his name was Dewayne Lewis, and that evidence of his assistance with a known drug conspirator would be located in the hotel room.[2]

The police, armed with facts that led them to believe a man who was part of Bates's criminal drug conspiracy was located in Room 211 of the Red Roof Inn, applied for a search warrant. Had they known that one of the factors they cited in the probable cause affidavit as evidence that there was a fair probability that contraband was inside the room was potentially based on an illegal search, the police would have continued their efforts to locate the Defendant. He was suspected of aiding a fugitive in a large-scale drug operation. The Defendant cannot argue that the police would not have sought a warrant, as their actions prove just the opposite. On the question of whether a neutral magistrate would have issued a warrant had the application contained all the evidence known to the officers except the dog alert, the Court also finds for the Government.

Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is far short of certainty; it requires only a probability or substantial chance of criminal activity, not an actual

---

[2] The Defendant continues to press the point that investigators originally relied on the personal identifiers for a different Dewayne Lewis. However, it was not critical to the probable cause determination whether the investigators were certain that the Dewayne Lewis they believed was in the hotel room was the same Dewayne Lewis they identified as their target earlier in the investigation. The whole point of their investigation was to find the person associated with the phone number Bates provided to the confidential informant. They knew his name was Dewayne Lewis. They simply did not realize until later that there was a second Dewayne Lewis who lived in a suburb of Indianapolis.

showing of such activity or even a probability that exceeds 50 percent. *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012). There was a fair probability, based on the facts outlined above, that a person named Dewayne Lewis was located in Room 211, and that he was a member of Bates's drug conspiracy. Additionally, because the absconded Bates was still relying on his communications with Lewis to accomplish tasks in Indiana, there was a fair probability that evidence connected to the conspiracy would be in the hotel room. The fact that Lewis's wife had just delivered a duffle bag to his hotel room under circumstances that could be considered suspicious, only added to this probability.

Even if the warrant application was not successful, the chain of events do not suggest that the police would have abandoned their efforts. *See United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) (advising that probable cause alone is not what makes a discovery inevitable, "but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search"). The Government presents the following argument:

> In light of the massive hunt for Nap, the Marshals surely would have continued to surveille the room. At some point, Lewis would have had to leave. If he checked out of his room without the drugs, he would have abandoned any reasonable expectation of privacy he had in them. And if he left with the drugs in his possession, the government surely had reasonable suspicion to detain him, and a drug dog surely would have sniffed out the massive quantity of drugs on his person.

(Gov't's Obj. 9–10.) This reasoning is persuasive.

Exclusion of evidence "has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The focus of the exclusionary rule is "on the efficacy of the rule in deterring Fourth Amendment violations in the future." *Herring v. United States*, 555 U.S. 135, 141 (2009). Therefore, "an assessment of the flagrancy of the police misconduct constitutes

an important step in the calculus" of applying the exclusionary rule. *United States v. Leon*, 468

U.S. 897, 911 (1984); *see also Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule,

police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and

sufficiently culpable that such deterrence is worth the price paid by the justice system.").

Additionally, the benefits of deterrence must outweigh the substantial social costs. *Herring*, 555

U.S. at 141. "The rule's costly toll upon truth-seeking and law enforcement objectives presents a

high obstacle for those urging its application." *Id.* (quoting *Penn. Bd. of Probation and Parole v.

Scott*, 524 U.S. 357, 364–65 (1998) (brackets omitted)).

This is not a case where the police simply disregarded the Defendant's constitutional

rights. The use of the dog at the hotel would not have triggered to a reasonable officer that he

was overstepping any constitutional bounds. In applying for a search warrant, they fully

disclosed that a dog sniff had been conducted. Investigators did not enter the room until they had

first obtained a search warrant. The Court has no doubt that if there had been no drug dog

involved, or if the investigators had believed that the use of the dog was illegal, they would have

relied upon the other information within their knowledge to obtain a search warrant. Had the

warrant been denied, the police would have continued to use valid investigative techniques to

apprehend the Defendant, which would have led to the location of the contraband. Because the

police would have obtained the evidence if no misconduct had taken place, excluding the

evidence would not serve the purpose of the exclusionary rule. Invoking the exclusionary rule

would put the police (and society) not in the *same* position they would have occupied if the drug

dog had not been used outside the hotel room, but instead, in a *worse* position.

Based on the foregoing, even if the Court assumes for the sake of argument that the dog

sniff violated the Defendant's rights, the Court would nevertheless find that the evidence

uncovered during execution of the search warrant should not be suppressed. Neither then, would

the Court exclude the Defendant's subsequent statements to investigators as derivative of an

illegal search.

## C.        Remaining Argument

Because the Magistrate Judge found that the evidence obtained during the search of the

hotel room should be suppressed, she did not address another of the Defendant's arguments in

favor of suppression. Presumably, in light of his Court's findings and its decision not to adopt

the Report and Recommendation in its entirety, the Defendant would continue to press that

argument, and so the Court will address it now.

One issue in this case centers around the trap and trace warrant the investigators obtained

for phone number 317-507-8010. The officers began receiving information from the phone

company, Sprint, under the search warrant on February 3, 2015. The warrant application had

described a Dewayne Lewis with a different birth date, who is not the Defendant Dewayne

Lewis, who was wanted on a parole violation. The Defendant asserts that the officers, upon

discovering that the warrant contained information for a different person, should have informed

the magistrate who issued the warrant of the new facts, and stopped relying on the trap and trace

information to locate his cellular phone.

Officers have an obligation to stop executing a warrant once they become aware

of a material error in the facts underlying probable cause for the warrant; the executing officers

must return to the neutral magistrate for a determination as to whether probable cause continues

to exist. *See Maryland v. Garrison*, 480 U.S. 79, 86–87 (1987) (once officers are put on notice of the risk of error within the warrant, they are required to discontinue the search); *Jones v. Wilhelm*, 425 F.3d 455, 464 (7th Cir. 2005) ("Where an officer executing a warrant knows or should have known that a warrant, which was valid when issued, now lacks the necessary particularity, then that officer cannot legally execute the warrant."); *United States v. Bowling*, 900 F.2d 926, 933 (6th Cir. 1990) (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)) (finding that the Supreme Court's admonition "that in the absence of urgent circumstances officers should rely not on their own discretion, but should instead resort to a neutral magistrate, to determine whether probable cause to conduct a search exists" "is equally applicable to cases in which officers possess a warrant but are alerted to circumstances which affect the probable cause for its execution").

The problem for the Defendant is that the evidence does not support his claim that the officers continued to trace this cellular phone with the trap and trace warrant once they learned that a different Dewayne Lewis was the correct target. The last email notification was sent no later than 11:34 a.m., well *before* officers realized the informant had potentially made a mistake about Nap's identity. Officer Harshman explained that, once the independent surveillance identified Room 211 of the Red Roof Inn as a focal point, there was no further need to look at tracing emails, which did not even provide pinpoint information. Officer Hess, who had set up the Sprint emails to be forwarded to Officer Harshman, removed Officer Harshman from the email list after surveillance saw the arrival of the white Cadillac. Accordingly, there is no basis for suppression of evidence based on the mistaken identification in the trap and trace warrant.

The Defendant argues that there were other deficiencies in the trap and trace warrant, but

none of these arguments are persuasive. He submits that the affidavit for the trap and trace warrant, on its face, did not establish probable cause. The basis for this claim is that it relied on an informant's tip, which identified the wrong Dewayne Lewis. The informant's mistake, however, is not proof that the information in the application for the trap and trace warrant failed to establish probable cause. The Defendant also complains that the FBI analyst, Officer Keszei, Officer Martinez, and the informant did not appear with Officer Harshman to obtain the warrant from the magistrate. There is no requirement that each individual with knowledge about what it provided in an application for a search warrant be present before the issuing judge.

### D.    Miscellaneous

In the Defendant's Response to Government's Objection Regarding Report and Recommendation, the Defendant takes issue with the name of an Assistant United States Attorney appearing on the Government's Objection because that particular attorney did not file a separate appearance. He maintains that this "reveals a disregard for Court procedure." (Def.'s Resp. 1, ECF No. 268.) The rule governing attorney appearances in this Court, however, specifically states that the attorneys who must file an appearance when they represent a party are those "*not* representing the United States or its agencies." N.D. Ind. L.R. 83-8 (emphasis added). Thus, the Government's use of an attorney in the United States Attorney's Office did not necessitate that the attorney enter an appearance.

The Report and Recommendation addressed two miscellaneous motions that related to the consolidated motion and the issues under consideration. The Court has reviewed the Magistrate Judge's recommendation that the Defendant's Motion to Quash Search Warrant be

denied, and that his Motion to Amend Hearing Issues be denied as moot. Neither party has objected to these portions of the Report and Recommendation, and the Court adopts those recommendations for the reasons stated in the Report.

The Court also reminds the Defendant that any of his arguments pertaining to the applications for the trap and trace warrant or the hotel search warrant are beyond the scope of this Opinion and Order. In an Opinion and Order [ECF No. 22] issued on October 11, 2016, the Court ruled that the Defendant was not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978), with respect to the trap and trace warrant. Nothing in the subsequent evidentiary hearing or briefing undermines that decision. There is no evidence that Officer Harshman lied or recklessly disregarded the truth in making the affidavit for the trap and trace warrant, nor is there any evidence to support the Defendant's allegation that Officers Keszei and Martinez knowingly misled Officer Harshman in order to obtain the warrant.

Likewise, on October 11, 2016, the Court issued an Opinion and Order [ECF No. 201] denying the Defendant's Motion for *Franks* Hearing on Search Warrant for Hotel Room. The Court determined that the probable cause affidavit provided the issuing judicial officer with a substantial basis to find probable cause, and that the Defendant was not entitled to a *Franks* hearing because he had not demonstrated a material falsity or omission that would alter the probable cause determination, and a deliberate or reckless disregard for the truth.


**CONCLUSION**

For the reasons stated above, the Court ACCEPTS IN PART and REJECTS IN PART the Report and Recommendation [ECF No. 265]. The Court ADOPTS the findings of fact, ADOPTS

the disposition of the Motion to Quash Search Warrant and the disposition of the second Motion to Amend Hearing Issue, but REJECTS the recommended disposition of the consolidated motion. Accordingly, the Defendant's consolidated motion [ECF No. 33] is DENIED; the Defendant's Motion to Quash Search Warrant [ECF No. 72] is DENIED; the Defendant's second Motion to Amend Hearing Issue [ECF No. 85] is DENIED AS MOOT. A scheduling conference will be set by separate order.

SO ORDERED on July 10, 2017.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT