| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CAUSE NO.: 1:15-CR-10-TLS |
| DEWAYNE LEWIS | |

## OPINION AND ORDER

The Defendant, Dewayne Lewis, was charged with one count, that on or about February 1, 2015, he violated 21 U.S.C. § 841(a)(1), by knowingly and intentionally possessing, with the intent to distribute, a controlled substance, namely 5 kilograms or more of cocaine. At the request of the parties, and after the Defendant knowingly waived his right to a trial by jury [ECF No. 376], the Court conducted a criminal bench trial from October 9, 2018, through October 11, 2018. At the conclusion of the trial, the Court set the deadline for the Defendant's requested opportunity to file proposed findings of fact (Tr. 590.5–8). After the Defendant's request [ECF No. 391], an extension was granted [ECF No. 393], and the Defendant's Request for Special Findings of Fact were filed on February 19, 2019 [ECF No. 403]. On that same day, the Court conducted an in-person hearing [ECF No. 405], at which the Defendant chose to proceed pro se and asked that the Court allow him to file additional proposed findings of fact, after the Government had filed its own, among other documents. The Court granted the Defendant's request. The Government filed its Proposed Findings of Fact on March 19, 2019 [ECF No. 423] and the Defendant filed his Supplemental Proposed Findings of Fact on March 22, 2019 [ECF No. 424]. On April 5, 2019, the Defendant filed a Response to the Government's Proposed Findings of Fact [ECF No. 432], to which the Government replied [ECF No. 433] on April 9, 2019; and the Defendant filed a final Response to the Government's Reply on April 16, 2019 [ECF No. 435]. The Court has reviewed all these submissions before reaching its decision.

## PRESENTATION OF EVIDENCE

On October 9, 2018, the Government began its case in chief by presenting Jay Arnold as a fact witness. (Tr. 13.15–20). Arnold is a Detective Sergeant with the Greenwood Police Department. (Tr. 14.6–11). Arnold identified Government's Exhibits 1 through 10, as various photographs from the search conducted at room 211 of the Red Roof Inn on February 3, 2015. (Tr. 18.8–10; 20.11–17; 23.10–15; *see generally* Tr. 23–44).

After the Defendant cross-examined Arnold, the Stipulation regarding chain of custody [ECF No. 386] was read into the record.

Next, the Government presented fact witness Kyle Freeman, a detective with the Drug Enforcement Section of the Indiana State Police. (Tr. 56.15–57.14). Freeman identified Government's Exhibits 11 through 29, including sub-exhibits (e.g., 20-A through 20-C), as various photographs also from the search conducted at room 211 of the Red Roof Inn on February 3, 2015. (Tr. 59.2–6; 60.17–20; 61.23–25; *see generally* Tr. 62–81). Freeman also identified Government's Exhibit 30, as a bag with a note on top of it, depicted in some of the earlier exhibits. (Tr. 81.15–82.2). The parties later stipulated to the admissibility of Exhibit 30. (Tr. 126.21–127.8).

Next, the Government presented fact witness Jason York. (Tr. 97.6–9). York is an officer with the Greenwood Police Department, assigned to the U.S. Marshals Great Lakes Fugitive Task Force. (Tr. 97.13–19).

Next, the Government presented fact witness Kelly Stewart. (Tr. 104.22–25). Stewart is a special agent with the FBI. (Tr. 105.4–8). Stewart identified Government's Exhibits 31 through 37, including sub-exhibits, as photographs documenting the condition of certain sealed evidence boxes containing currency during stages of opening the box and the packages of currency inside (Tr. 106.7–22; 107.7–11; *see generally* Tr. 107–17). Stewart also identified Government's

Exhibits 37-A and 37-B, as photographs of, respectively, a red duffel bag and its contents. (Tr. 116.20–17.4).

After the Defendant cross-examined Stewart, the Stipulation regarding fingerprints [ECF No. 379] was read into the record.

Next, the Government presented fact witness Jon K. Sacchini. (Tr. 134.6–9). Sacchini is a special agent with the FBI. (Tr. 134.10–12). Sacchini identified Government's Exhibit 44 as the scenes he sketched for the January 27, 2015, search of 1940 County Road 75, in Butler, Indiana. (Tr. 135.3–21; *see generally* 135–40).

Next, the Government presented fact witness Andrew Willmann. (Tr. 144.21–24). Willmann is a special agent with the FBI. (Tr. 144.25–45.1). Willman identified Government's Exhibits 45-A through 45-F as photographs of the items of "evidentiary value" taken during the January 27, 2015, search of 1940 County Road 75, in Butler, Indiana. (Tr. 146.2–9; 147.3–15; *see generally* Tr. 148–49).

Next, the Government presented Tim Bates. (Tr. 150.22–25). Tim Bates is no relation to Allan Bates, who testified later in the trial. (Tr. 151.1–3). Tim Bates is a special agent with the FBI. (Tr. 151.4–5). Tim Bates identified Government's Exhibits 48-A through 48-E[1] as photographs taken during a January 27, 2015, search of 4126 Richfield Lane in Fort Wayne, Indiana. (Tr. 151.24–52.2; 152.12–53.7). Tim Bates also identified Government's Exhibit 47 as a photocopy of a drug ledger located during the same search. (Tr. 153.19–54.7). The exhibits were conditionally admitted upon presentation and admitted without conditions after the parties argued an objection to relevancy. (Tr. 257.7–17).

Next, the Government presented Aldalberto Martinez as a fact witness; Martinez works for the Indiana State Police and is currently assigned to the FBI's Fort Wayne Safe Streets Gang

---

[1] All references to an Exhibit 48-F are in error; there was no Exhibit 48-F. (Tr. 536.1–12).

Task Force. (Tr. 158.12–24). Martinez identified Government's Exhibit 40 as two disks containing the recorded interview with Dewayne Lewis, the Defendant, which took place on February 4, 2015. (Tr. 166.3–67.2). Martinez also identified Government's Exhibit 39 as the waiver of Miranda Rights referenced in the interview. (Tr. 167.19–68.18). Upon the conclusion of reviewing Exhibit 40, the Court recessed for the day. (Tr. 178.8–11).

On October 10, 2018, Martinez's testimony as a fact witness continued. (Tr. 215.1–15). Martinez identified Government's Exhibit 41 as a photograph, shown to the Defendant during the interview recorded on Exhibit 40, which according to that interview, depicts the Defendant (Tr. 217.16–22; 218.16–19.3). Martinez also identified Government's Exhibits 38-A through 38-C as a map and aerial views of the area of 1940 County Road 74, in Butler, Indiana. (Tr. 223.8–24.18). Martinez also identified Government's Exhibits 42-A through 42-E as photographs of the hiding place at the 1940 Country Road 75 address. (Tr. 227.8–233.21).

After the conclusion of Martinez's fact testimony, the Stipulation regarding Controlled Substances at the Greenwood Room [ECF No. 381] was read into the record. (Tr. 252.21–53.17).

The Government next presented fact witness Brad Shultz, a patrol trooper in Allen County with the Indiana State Police. (Tr. 258.15–23). Shultz identified Government's Exhibits 43-A through 43-E as photographs depicting a truck, which Shultz stopped, and the items found in the truck. (Tr. 268.21–69.23). The exhibits were admitted after the Defendant's objection to relevancy was overruled. (Tr. 508.22–10.14).

The Government next presented fact witness James Lepper. (Tr. 271.15–19). Lepper has pled guilty, and as part of his plea agreement, agreed to testify truthfully; he hopes to receive a benefit for his testimony. (Tr. 281.9–23).

The Defendant next presented fact witness Brian Harshman as part of his case in chief;[2] Harshman works for the Indiana State Police and is assigned to the U.S. Marshals Service Fugitive Task Force in Indianapolis. (Tr. 284.9–14).

The Government next presented Rob Smith, a trooper with the Indiana State Police. (Tr. 291.16–19). Smith identified Government's Exhibits 46-A through 46-F as photographs depicting various items of evidence found at 7212 Treverton Drive during a search on January 27, 2015. (Tr. 293.9–18; 298.24–99.23). The items were admitted without conditions after the Court ruled on the Defendant's objection to relevancy. (Tr. 508.22–10.14).

After the conclusion of Smith's testimony, the Stipulation regarding Controlled Substances at the Treverton Drive Residence [ECF No. 380] was read into the record. (Tr. 304.24–06.16).

The Government next presented fact witness Jeffrey Robertson, a special agent with the FBI. (Tr. 309.6–12).

The Government next presented Michael Irvin, a senior forensic examiner with the FBI. (Tr. 319.19-20.6). Irvin was accepted as an expert in the area of forensic data retrieval from cellular phones. (Tr. 325.11–20). Irvin identified Government's Exhibit 49 as a broken telephone he reviewed. (Tr. 326.11–27.15; 330.15–24). Irvin also identified Government's Exhibits 50-A through 50-C as various sheets containing data from Exhibit 49. (Tr. 338.4–39.16; 342.20–45.21; 342.6–21).

The Government next presented fact witness Allan Bates. (Tr. 350.8–11). Bates has pled guilty, and as part of his plea agreement, agreed to testify truthfully; he hopes to receive a benefit for his testimony. (Tr. 352.12–53.15).

---

[2] Harshman was presented out of order by agreement of the Court and the Government. (Tr. 283.2–18).

The Government next presented fact witness Christopher Cook. (Tr. 410.11–17). Cook has pled guilty, and as part of his plea agreement, agreed to testify truthfully; he hopes to receive a benefit for his testimony. (Tr. 410.23–11.15). After Cook was excused, the evidence presentation ceased for the second day of trial. (Tr. 422.22–23.3).

On October 11, 2018, the Government presented Martinez as an expert witness on the subject of drug trafficking. (Tr. 476.14–17). After the conclusion of Martinez' testimony, the Government moved to admit Exhibit 51, certified records from the Red Roof Inn, showing that "Michael Jackson" rented room 211; noting that the records were a copy, and that the parties stipulated that "Michael Jackson" was a separate individual from the Defendant, the Court admitted the exhibit. (Tr. 510.23–15.5). The Government then rested. (Tr. 515.24).

For the Defendant's case in chief, he began by presenting fact witness James Keszei, a special agent with the FBI. (Tr. 517.17–24). The Defendant then presented fact witness Thomas Boyle. (Tr. 522.12-19). The Defendant then rested.

Each side presented closing arguments. (*see generally* Tr. 538–591).


**FINDINGS OF FACT**

Based on the evidence presented, the Government has established the following facts beyond a reasonable doubt:


**A.      Allan Bates' Drug Operation**

1.   Allan Bates oversaw a drug trafficking operation. (A. Bates testimony, Tr. 358.17–19; Tr. 379.12–13) (Martinez fact testimony, Tr. 158.22–24; Tr. 164.5–10).

2.   The drug operation involved multiple individuals, including:

   a.   James Lepper, who owned several locations that the organization used in its activities, including 1940 County Road 75, in Butler, Indiana (Butler property), and a

warehouse; (Lepper testimony, Tr. 271.22–72.16) (A. Bates testimony, Tr. 359.13–22);

b. Larry Norton, who distributed drugs and collected money; (A. Bates testimony, Tr. 353.25–54.6);

c. Albert Mendez, who was Bates's boss; (A. Bates testimony, Tr. 362.22–23; 379.17–20);

d. Moises Hernandez, "Moe," a truck driver who would pick up currency; (A. Bates testimony, Tr. 379.10–11; Tr. 376.23–25);

e. Various distributors, usually identified by nicknames, including: "Akron," "Toledo," "Detroit," and "Lima;" (A. Bates testimony, Tr. 359.7–12; Tr. 363.17–23; Tr. 366.10–16; Tr. 373.20–25); and

f. The Defendant, who was Bates's "partner" and one of his largest distributors, who would receive as many as 15 to 20 kilograms of cocaine at a time; (A. Bates testimony, Tr. 357.8–11; Tr. 363.14–16; 364.6–8).

3. The organization would receive drugs from, and ship currency to, Bates's supplier in Mexico, using semi-trucks to transport. (Lepper testimony, Tr. 273.21–25; Tr. 276.1–11; Tr. 274.14–16) (A. Bates testimony, Tr. 359.23–60.4)

4. The operation had a process for packaging money, which included putting rubber bands on bundles, then vacuum sealing the money, labeling the amount, covering it in duct tape and wiping it down with some sort of cleaner, because the money needed to be packaged to certain dimensions to fit in the trucks the operation used. (A. Bates testimony, Tr. 355.4–21; Tr. 392.13–17) (Martinez Expert Testimony, Tr. 479.19–81.1, see also Gov't Ex. 2).

5. As part of his role in this operation, Bates kept a ledger recording his various transactions, which the FBI eventually located in one of its searches. (A. Bates

testimony, Tr. 372.4–7 and Gov't's Ex. 47) (T. Bates testimony, Tr. 151.24–52.17; 153.19–54.7 and Gov't's Exs. 48-E and 47; Tr. 156.22–57.7).

6. The ledger shows large amounts of product changing hands; specifically, the ledger shows "Nap," the Defendant identified by nickname, receiving product worth hundreds of thousands of dollars. (A. Bates testimony, Tr. 373.14–17; 374.1–11).

7. Casual users of drugs might keep as much as a gram of cocaine valued at around $50 to $100, but kilogram quantities and thousands of dollars of cash are suggestive of distribution. (Martinez expert testimony, Tr. 478.20–479.11).

**B.     The Defendant's Role After Allan Bates Flees to Mexico**

8. On January 27, 2015, the same date that a number of search warrants were executed at suspected stash houses (*see* ¶ 11 below; *see also* T. Bates testimony, Tr. 151.24–52.2; Martinez fact testimony, Tr. 171.1–3 and 171.18–24), law enforcement attempted to arrest Allan Bates; however, he was able to evade law enforcement during a vehicle pursuit. (Martinez testimony, Tr. 171.4–9).

9. After fleeing law enforcement, Allan Bates traveled to Mexico, where he lived until he was detained in March 2015. (A. Bates testimony, Tr. 365.22–366.3 confirmed by testimony of Martinez, Tr. 221.11–17).

10. After Allan Bates fled to Mexico, he reached out to the Defendant to collect money from his other distributors to send back to his boss in Mexico. (A. Bates Testimony Tr. 365.16–23; Tr. 384.2–8; Tr. 386.15–87.22 and Gov't's Ex. 50; *see also* various text messages between A. Bates and the Defendant, e.g. "you the boss now" text message, A. Bates Testimony, Tr. 389.7–19 referencing Gov't's Ex. 50; Tr. 389.20–91.10).

**C.**     **The Hiding Place on the Butler Property**

11.    On January 27, 2015, the FBI executed a search warrant at the Butler property, 1940 County Road 75. (Sacchini testimony, Tr. 135.3–12) (Willmann testimony, Tr. 146.2–5) (Martinez testimony, Tr. 227.8–12) (Robertson testimony, Tr. 310.13–18).

12.    During the search at the Butler property, various items of evidentiary value were found, including a digital scale (Gov't's Exs. 45-A and B); a roll of plastic wrapping (Gov't's Exs. 45-C, D, and E); and a money counter (Gov't's Ex. 45-F). (Willmann testimony, Tr. 147.3–15)

13.    However, some items were missed during the search of the Butler residence, specifically items located in a hiding place in the "pole barn." (Martinez testimony, Tr. 227.17–23) (Robertson testimony, Tr. 314.24–15.15 and Gov't's Ex. 42-A) (A. Bates testimony, Tr. 377.25–78.8).

14.    The hiding place was underneath the stairs, behind a shelving unit. (Martinez testimony, Tr. 228.8–29.20 and Gov't's Ex. 44, pg. 3; Tr. 230.5–17 and Gov't's Ex. 42) (Lepper testimony, Tr. 278.23–80.24 and Gov't's Exs. 44 and 42-A) (A. Bates Testimony, Tr. 360.20–61.24 and Ex. 42-A).

15.    The items included well over a million dollars in cash, and between 19 and 20 kilos of cocaine. (A. Bates Testimony, Tr. 378.23–79.9; Tr. 385.5–9).

16.    Moises Hernandez, who stayed at the pole barn's residential area and was present during the January 27, 2015 search, (Lepper testimony, Tr. 277.21–22; Robertson Testimony, Tr. 311.4–19), told Bates that items had been missed in the search. (A. Bates Testimony, Tr. 378.15–22).

**D.    Retrieval of the Items from the Hiding Place**

17.    Allan Bates directed Christopher Cook and the Defendant to retrieve the currency and

drugs from the hiding place in the pole barn that the FBI had missed in its search. (A.

Bates Testimony, Tr. 379.24–80.6) (Cook testimony, Tr. 413.21–14.19).

18.    On February 1, 2015, the Defendant traveled to the Butler property, with Christopher

Cook, and collected drugs and currency from the hiding place that the FBI had missed

in its search. (Gov't's Ex. 40, Interview of the Defendant, at timestamp 20:20 through

24:45 and 1:28:05 through 1:31:05; see also testimony of Martinez, Tr. 234.7–16)

(Cook testimony Tr. 414.12–15.11; Tr. 416.20–25; earlier statements confirmed by

testimony of Martinez, Tr. 242.20–43.22) (Martinez testimony, Tr. 247.4–17); (A. Bates

testimony Tr. 380.17–25; Tr. 38.91–83.1).

19.    Originally, only Christopher Cook went in to retrieve the packages, but the Defendant

entered to assist. (Cook testimony Tr. 418.7–20.13) (A. Bates testimony Tr. 382.9–12).

20.    The Defendant reported to Bates that only 19 kilos were in the hiding place, instead of

the expected 20. (A. Bates testimony, Tr. 383.4–9) (Gov't's Ex. 40, Interview of the

Defendant, at timestamp 1:31:20 through 1:31:45).

21.    After Cook and the Defendant collected the packages, the Defendant kept most of the

packages, stored in suitcases he had purchased at Wal-Mart. (Cook Testimony, Tr.

421.1–20).

**E.    The Defendant's Arrest on February 3, 2015**

22.    On February 3, 2015, the Defendant was found in the Red Roof Inn, room 211. (Arnold

testimony, Tr. 18.7–10; Tr. 22.12–23) (Freeman testimony, Tr. 60.15–61.16; Tr. 62.3–

14 and Gov't's Ex. 11) (York testimony, Tr. 99.13–100.3).

23. The room contained many packages of suspected narcotics, wrapped in duct tape. (Arnold testimony, Tr. 25.5–8; Government's Ex. 1) (Freeman testimony, Tr. 65.6–16 and Gov't's Ex. 15).

24. All the suspected narcotics from room 211 were sealed into a box. (Arnold testimony, Tr. 38.17–39.2).

25. After Task Force Officers picked up the suspected narcotics and brought them to the Fort Wayne FBI office, Officers Martinez and Keszei packaged and sealed them into evidence as FBI 1B386. (Martinez testimony, Tr. 215.18–23).

26. The controlled substance in FBI 1B386 is cocaine, with a net substance weight of 19.8 kilograms. (Tr. 45, citing Stipulation – Controlled Substances, Greenwood Room, ECF No. 381, ¶ 3).

27. Also, the room contained duffel bags with packages of currency. (Arnold testimony, Tr. 26.20–27.7 and Government's Exs. 3A–B[3]; Tr. 28.17–29.1 and Government's Ex. 4; Tr. 29.18–19 and Government's Exs. 5 and 6[4]) (Freeman testimony, Tr. 67.5–14 and Gov't's Ex. 16; Tr. 67.25–68.9 and Gov't's Ex. 17 and 18[5]; Tr. 70.22–71.1 and Gov't's Exs. 20-A and 20-C; Tr. 73.22–74.17 and Gov't's Exs. 22-A and 22-B; Tr. 76.18–21 and Gov't's Ex. 25; Tr. 80.6–9 and Gov't's Ex. 28).

28. The bags found by the police in room 211 match the bags purchased by the Defendant at Wal-Mart. (*Cf.* Cook testimony, Tr. 422.7–13 identifying Gov't's Ex. 6, and Arnold testimony, Tr. 29.18–19 and Government's Exs. 5 and 6).

29. The packages of currency had Allan Bates's handwriting on them. (A. Bates testimony, Tr. 391.25–92.2 and Gov't's Ex. 3-A)

---

[3] Exhibit 3-B depicts the same bag as Government's Ex. 3-A, see Tr. 27.25–28.3.
[4] Exhibit 6 depicts the same grouping of bags as Exhibit 5, see Tr. 30.23–25.
[5] Exhibit 18 depicts the same area as Exhibit 17, see Tr. 68.1–69.4.

30.   The packages of currency gave off a heavy aroma of ammonia. (Freeman testimony, Tr. 117.19–23).

31.   The room also contained currency that was not packaged but was in rubber bands, other containers, and otherwise loose. (Arnold testimony, Tr. 31.15–19 and Gov't's Ex. 7) (Testimony of Freeman, Tr. 75.2–22 and Gov't's Ex. 23-A; Tr. 76.21–23 and Gov't's Ex. 25; Tr. 78.24–79.1 and Gov't's Ex. 26-B).

32.   The currency had notes associated with them, with city names – for example, Lima, Detroit, and Akron. (Arnold testimony, Tr. 25.14–26.15; Government's Ex. 2; Tr. 29.20–23 and Government's Ex. 5) (Freeman testimony, Tr. 69.7–18; Tr. 71.9–21 and Gov't's Ex. 20-B; Tr. 74.12–13 see also Tr. 77.22–78.16 and Gov't's Exs. 22-B and 26-A; Tr. 75.17–19 and Gov't's Ex. 23-B; Tr. 76.21–23 and Gov't's Ex. 25; Tr. 81.21–82.2).

33.   The final amount of the collected currency, after appropriate processing, *see generally* Stewart testimony, Tr. 108–117 and Sacchini testimony, Tr. 141–43, was almost $2.1 million. (Stewart testimony, Tr. 117.13–18).

## ANALYSIS

The Government charged the Defendant with violating 21 U.S.C. § 841(a)(1): that on or about February 1, 2015, he knowingly and intentionally possessed, with the intent to distribute, a controlled substance including 5 kilograms or more of cocaine. [ECF No. 22]. To find the Defendant guilty of this charge, the government must have proved: (1) the Defendant knowingly possessed cocaine; (2) the Defendant intended to distribute the cocaine to another person, and (3) the Defendant knew the cocaine was some kind of a controlled substance. Pattern Crim. Jury Instr. 7th Cir. 21 U.S.C. § 841(a)(1) Possession With Intent to Distribute – Elements (2012) (plus 2015-2017 and 2018 changes). Additionally, the Court must determine the amount of cocaine

that the Government has proved was involved in the offense. Pattern Crim. Jury Instr. 7th Cir.

Drug Quantity/Special Verdict Instructions (2012) (plus 2015-2017 and 2018 changes).

**A.**     **The Defendant Knowingly Possessed 5 Kilograms or More of Cocaine**

A person acts knowingly if he realizes what he is doing and is aware of the nature of his

conduct, and does not act through ignorance, mistake, or accident. Pattern Crim. Jury Instr. 7th

Cir. 4.10 Knowingly – Definition (2012) (plus 2015-2017 and 2018 changes). And, a person

possesses an object if he knowingly has the ability and intention to exercise control over the

object, either directly or through others. Pattern Crim. Jury Instr. 7th Cir. 4.13 Definition of

Possession (2012) (plus 2015-2017 and 2018 changes). The Court finds beyond a reasonable

doubt that the Defendant knowingly possessed more than five kilograms of cocaine.

The facts detailed above establish that, on February 1, 2015, the Defendant traveled with

Christopher Cook to the Butler property and assisted him in retrieving and carrying packages

(¶¶ 17–19). The Defendant knew that the packages contained more than 5 kilograms of cocaine

(¶¶ 17, 20). The Defendant also then retained the drugs after he and Christopher Cook separated

(¶ 21). Thus, the Defendant knowingly possessed more than 5 kilograms of cocaine.

That the Defendant knowingly possessed the drugs is further demonstrated by the

circumstances of his arrest. The Defendant was arrested with 19.8 kilograms of cocaine (¶¶ 22–

27), and bags which matched the bags Cook saw him purchase after they took possession of the

cocaine (¶ 28). These facts further reinforce the conclusion that the Defendant knowingly took

possession of more than 5 kilograms of cocaine on February 1, 2015.

**B.**     **The Defendant Intended to Distribute the Cocaine to Another Person**

To establish the Defendant's intent, the Government presented a great deal of background

information on Bates's drug trafficking operation. The Court has found that the Defendant was a

major distributor for Bates, who regularly took large quantities of product (¶¶ 2.f, 6). Further, Bates's testimony shows, beyond a reasonable doubt, that the Defendant was in charge of the operation after Bates's departure to Mexico (¶ 10). Additionally, the quantities of cash and drugs recovered from the pole barn alone support a conclusion that the Defendant intended to distribute and not just keep the drugs (¶ 7). Thus, the Court can infer, beyond a reasonable doubt, that the Defendant intended to distribute the cocaine to another person. Pattern Crim. Jury Instr. 7th Cir. 21 U.S.C. § 841(a)(1) Definition of Distribution (2012) (plus 2015-2017 and 2018 changes) ("a person 'distributes' a controlled substance if he delivers or transfers possession of the controlled substance to someone else").

### C.    The Defendant Knew the Packages Contained Cocaine

Again, the facts establish that the Defendant knew that the packages he helped collect, and then retained in his possession, contained more than 5 kilograms of cocaine (¶¶ 18–20). The context in which the Defendant knew Allan Bates – as a major distributor of drugs for him, and as an operator within his organization who was now gathering currency to send back to him in Mexico (¶¶ 2.f, 10) – further supports that the Defendant knew these packages contained drugs.

### D.    The Cocaine was more than 5 Kilograms

As Bates testified, and the Defendant confirmed in his confession, the Defendant messaged Bates that there were 19 kilograms, not 20 kilograms, in the packages he retrieved from the hiding place at the Butler property (¶¶ 15, 20). Particularly when compared with the total amount of narcotics the Defendant was found possessing two days later in the Red Roof Inn, room 211, namely 19.8 kilograms (¶ 26), the Court can conclude beyond a reasonable doubt that the Defendant possessed more than 5 kilograms of cocaine.

D.    **The Additional Evidence**

The evidence against the Defendant is overwhelming, when the Court considers the evidence found in the Red Roof Inn room 211 and the Defendant's confession. However, even without this evidence – in other words, even if evidence had been suppressed as requested in the Defendant's Motions to Suppress [ECF Nos. 33 and 406], and the Court had excluded the evidence from the hotel room, including the data from the Defendant's cellular telephone, and the Defendant's subsequent statements to the police – the Court would still find beyond a reasonable doubt that the Defendant was guilty of the indicted charge.

Allan Bates's and Christopher Cook's testimony, supported by the background evidence of the investigation, is enough to establish beyond a reasonable doubt that the Defendant knowingly possessed more than 5 kilograms of cocaine, with the intent to distribute it, and the Defendant knew it was a controlled substance. Although the Court is mindful that it must weigh the testimony of Allan Bates and Christopher Cook with caution and great care, Pattern Crim. Jury Instr. 7th Cir. 3.05 Witnesses Requiring Special Caution (2012) (plus 2015-2017 and 2018 changes), the Court nevertheless finds it persuasive beyond a reasonable doubt: first, the Court found the two witnesses credible based on their ability to see, hear, and know the things to which they testified, as well as their memory and demeanor; second, Allan Bates's testimony aligns with the investigating officers' understanding of other details of the investigation (*see, e.g.*, ¶ 18, Martinez citation); and finally, Cook's testimony agrees with Bates's testimony, which lends it further credibility.

**CONCLUSION**

For the reasons stated above, the Court finds the Defendant GUILTY on the single charge: that on or about February 1, 2015, he did knowingly possess, with intent to distribute,

more than 5 kilograms of cocaine. *See* Fed. R. Crim. P. 23(c). The Clerk is DIRECTED to enter

the Finding of Guilty, and the Defendant is ordered to remain in custody until sentencing.

SO ORDERED on April 24, 2019.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT