# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CAUSE NO.: 1:15-CR-10-TLS |
| | |
| DEWAYNE LEWIS | |

## OPINION AND ORDER

This matter is before the Court on the Government's and Defendant Dewayne Lewis's Objections to the Presentence Report[1] ("PSR"), as submitted to the Court in the Government's Letter Regarding Objections ("Gov't's Objections") [ECF No. 447] and Defendant Dewayne Lewis's Letter Regarding Objections ("Def.'s Objections") [ECF No. 448].

## FACTUAL AND PROCEDURAL BACKGROUND

The FBI Safe Streets Gang Task Force began investigating the drug trafficking activity of Alan Bates and his accomplices in or about July 2014. PSR ¶ 4, ECF No. 446. Bates was a leader of the Drug Trafficking Organization ("DTO") and had many trusted accomplices, including Larry Norton, Eric White, James Lepper, and the Defendant. *Id.* Bates was also a supplier to other dealers throughout the Midwest, including dealers nicknamed "Akron," "Toledo," "Detroit," and "Lima." *Id.* at ¶ 9. Although the DTO primarily operated in the Midwest, the DTO had significant ties, the extent of which are unknown to this Court, to a drug trafficking network in Mexico. *See, e.g.*, Tr. Transcript Oct. 10, 2018, at 158–59, 161, ECF No. 410.

---

[1] The Court notes that a Draft Presentence Investigation Report [ECF No. 445] and a Revised Draft Presentence Investigation Report [ECF No. 446] were filed in this case. The Revised Draft PSR was filed to remedy a clerical error on page twenty-eight, where the report inadvertently references a defendant in an unrelated cause. The two reports are otherwise indistinguishable. The Court also notes that the Defendant's objections refer to the Draft Presentence Investigation Report [ECF No. 445]. However, as the reports are, aside from one clerical error, identical, the Court will construe the Defendants objections to apply to the Revised Draft Presentence Investigation Report [ECF No. 446]. For simplicity, the Court will refer to the Revised Draft Presentence Investigation Report as the PSR for the purposes of this Opinion and Order.

The Defendant first met Bates in 2009 or 2010. PSR ¶ 9. Shortly thereafter, the Defendant started dealing marijuana for Bates. *Id.* Eventually the Defendant began selling both cocaine and heroin in addition to marijuana. *Id.* Bates and the Defendant's initial relationship was simple; Bates would front the Defendant drugs and keep track of what the Defendant owed him in a drug ledger. Tr. Transcript Oct. 10, 2018, at 156–57. The Defendant would then sell the drugs to his clients in Indianapolis, Indiana, and repay Bates with the proceeds. *Id.* During the bench trial, Bates testified that the Defendant would sometimes pick up 15–20 kilograms of drugs and described the Defendant as one of his best dealers. *Id.* at 155–56.

The DTO's operation was, relatively, complex. Drugs from Mexico would be shipped to a warehouse owned by Lepper in Angola, Indiana. PSR ¶ 4. The drugs would then be distributed to several dealers across the Midwest, including the Defendant. *Id.* After selling the controlled substances, the dealers would return the drug proceeds to Bates. *Id.* The drug proceeds would then be sent to the warehouse in Angola, Indiana, where they would be loaded into a tractor trailer's hidden compartments. *Id.* Ultimately, the drug proceeds would be transported to Mexico. *Id.* The PSR indicates that, in the interim, some of the drugs and money were stored at a pole barn, also owned by Lepper, in Butler, Indiana. *Id.* at ¶¶ 4, 10.

On November 7, 2014, the FBI, with the assistance of the Indiana State Troopers, stopped Norton for speeding on Interstate 69. *Id.* at ¶ 5. At that time, Norton was in the process of delivering money to Lepper's pole barn in Butler, Indiana. *Id.* During the traffic stop, the state trooper's drug dog alerted him to the presence of contraband. *Id.* After obtaining a warrant, the trooper searched the car and found $400,000 in duct-taped packages concealed in hidden compartments. *Id.* During the trial, Bates testified that about $80,000 of the seized amount was drug proceeds of the Defendant's. *Id.*

As a part of the FBI's investigation, a Confidential Human Source (CHS) was placed within the DTO. *Id.* ¶ 6. In December 2014, the CHS witnessed the Defendant deliver $100,000 of drug proceeds to Bates at the residence of Bates's father in Fort Wayne, Indiana. *Id.* At that time, Bates introduced the Defendant to the CHS, indicating that the Defendant's nickname was "Nap" and claiming that the Defendant was a killer who was constantly armed and not afraid to transport drugs. *Id.*

On January 27, 2015, FBI and assisting officers executed a number of search warrants on three locations central to the DTO's operations. *Id.* at ¶¶ 6–8. The first location was a stash house located in Fort Wayne, Indiana. *Id.* at ¶ 6. During the search of the stash house, law enforcement recovered approximately 66 kilograms of cocaine, 2 kilograms of heroin, and $615,800. *Id.* The second location was Lepper's residence and pole barn in Butler, Indiana. *Id.* at ¶ 7. During the search of the pole barn, law enforcement recovered firearms and drug packaging equipment. *Id.* at ¶ 7. Finally, the officers searched a residence in Fort Wayne, Indiana, and recovered a drug ledger and three firearms. *Id.* The same date, officers attempted to arrest Bates; however, he was able to escape the officers' pursuit. *Id.* ¶ 8.

Sometime after the searches, the Defendant helped Bates evade law enforcement by driving him to the United States-Mexico border. *Id.* at ¶ 20. While in Mexico, Bates continued to operate the DTO with the Defendant's assistance. *Id.* at ¶ 9. From January 27, 2015, until February 3, 2015, the Defendant was responsible for meeting with the other DTO dealers to deliver drugs and collect drug proceeds. *Id.* Bates was eventually apprehended in Mexico by law enforcement on or about March 1, 2015. *Id.*

During the search of Lepper's pole barn, law enforcement did not discover a secret compartment containing drugs and money. *Id.* at ¶ 10. Bates eventually learned that the contents

of the compartment had not been seized by law enforcement and enlisted the Defendant and Christopher Cook to retrieve the drugs and money. *Id.* The Defendant and Cook went to the pole barn on February 1, 2015, and were able to find the secret compartment by taking directions from Bates over the phone. *Id.* at ¶ 11.[2] The secret compartment contained 19 kilograms of cocaine and a large sum of cash, all of which except for $60,000 was taken by the Defendant. *Id.* at ¶¶ 10, 11, 21, 23. The remaining $60,000 was taken by Cook. *Id.* at ¶ 11.

While in Mexico, Bates gave the CHS the Defendant's phone number. *Id.* at ¶ 12. On January 29, 2015, the CHS provided the Defendant's number to the FBI. Around that time, the FBI began identifying and locating other members of the DTO. *Id.* The FBI, with the assistance of the United States Marshals Service, was able to locate the Defendant's phone in the general vicinity of Greenwood, Indiana. *Id.* After searching parking lots and businesses in Greenwood, Indiana, law enforcement determined that the Defendant was staying at a Red Roof Inn in the city. *Id.*

On February 3, 2015, the Greenwood Police Department obtained a search warrant for the Defendant's room at the Red Roof Inn. *Id.* at ¶ 13. When law enforcement entered the room, they found the Defendant along with various bags and packages containing money, drugs, and assorted drug paraphernalia. *Id.* at ¶¶ 13–14. In addition, the officers found a torn-up drug ledger and several cell phones, one of which had been broken in half. *Id.* at ¶ 13. Ultimately, approximately $2,089,000 and 19.8 kilograms of cocaine were recovered from the hotel room. *Id.* at ¶¶ 15, 16. The Defendant was arrested at that time. PSR p. 1.

On February 4, 2015, the Defendant spoke with law enforcement. *Id.* at ¶ 19. The interview was audio and video recorded and began with the Defendant confirming that he wanted

---

[2] This PSR indicates that this event took place on Super Bowl Sunday of 2015; however, it does not specify the calendar date. The Court takes judicial notice that the 2015 Super Bowl was held on February 1, 2015.

to be interviewed. *Id.* Additionally, the Defendant was advised of his Miranda rights, agreed that he understood his rights, and signed a written waiver of his rights. *Id.* During the interview, the Defendant confirmed that he was a member of Bates's DTO and informed law enforcement of the DTO's general operations. *Id.* at ¶ 20. During the Defendant's description of the DTO, he also identified other members of the operation. *Id.* The Defendant explained that he had driven Bates to Mexico and admitted to retrieving the drugs and money from Lepper's pole barn. *Id.* at ¶¶ 20–21. Finally, the Defendant confirmed that he broke one of the cell phones and tore up the drug ledger during law enforcement's raid of his hotel room. *Id.* at ¶ 20.

The evidence collected during the February 3, 2015 raid, including the cell phones and drug ledger, was submitted to specialists for review. *Id.* at ¶¶ 17, 24. An FBI Senior Forensic Examiner, pursuant to an additional search warrant, analyzed the data on the cell phones seized from the Defendants' hotel room. *Id.* at ¶ 17. Through this analysis, the examiner was able to recover the Defendant's text messages which showed that the Defendant had been collecting drug proceeds from the other DTO dealers. *Id.* For example, the Defendant had collected $256,000 from Akron and $170,000 from Lima. *Id.* at ¶ 18. Additionally, the text messages confirmed that the Defendant had met with Cook at Lepper's pole barn on February 1, 2015, and that he had recovered 19 kilograms of cocaine and $128,000. *Id.* The FBI's Cryptanalysis and Racketeering Records Unit determined that Bates's drug ledger showed that the Defendant owed Bates $730,000 for fronted cocaine and marijuana. *Id.* at ¶ 24.

On April 24, 2019, the Court, after a three-day bench trial [ECF No. 438], adjudged the Defendant guilty of one count of Possession with Intent to Distribute 5 kilograms or More of Cocaine, a Schedule II Controlled Substance in violation of 21 U.S.C. § 841(a)(1). The

conviction is a Class A Felony and carries a punishment of 10 years to life imprisonment and a $10,000,000 fine. *See* 18 U.S.C. § 3559; 21 U.S.C. § 841(b)(1)(A).

Sentencing for the Defendant was initially set for September 23, 2019. [ECF No. 440]. The Defendant then filed a Motion to Expedite Pre-Sentence Report/Sentencing Hearing [ECF No. 441], on May 29, 2019. In its June 24, 2019 Order [ECF No. 444], the Court granted the Motion to Expedite and a Sentencing Hearing was set for August 22, 2019. A Draft PSR [ECF No. 445] and a Revised Draft PSR [ECF No. 446] were filed on June 25, 2019.

Thereafter, both parties filed their objections with the Court. [ECF Nos. 447 and 448]. The Government made only one objection. In contrast, the Defendant submitted 19 pages of objections. Due to the number of objections made by the Defendant, the Government filed a Motion to Continue Sentencing and Motion for Briefing Schedule [ECF No. 449], on July 16, 2019. In its July 17, 2019 Order [ECF No. 450], the Court granted the motion and ordered both parties to file briefs in support of their respective objections by August 1, 2019, and replies to the other party's brief in support by August 16, 2019 [ECF No 450]. On July 26, 2019, the Government filed its Response to Defendant's Objections [ECF No. 454]. On August 1, 2019, the Defendant's Standby Counsel, James A. Hanson, filed Defendant's Brief in Support of Objections to Draft PSIR [ECF No. 457]. The Defendant adopted Hanson's brief on September 5, 2019, through an Affidavit [ECF No. 461]. The Government filed its Motion to Strike and Response Brief [ECF No. 458] on August 16, 2019.

The Court recognizes that the Defendant made many objections to the PSR; however, a majority of his objections, regardless of how they are resolved, will not influence the Court's determination regarding sentencing, including the Defendant's offense level and criminal history category. For this reason, the Court consolidates the objections in a step-by-step analysis through

the sentencing process. The issues before the Court are as follows: (1) whether certain relevant conduct is properly considered in calculating the base offense level, (2) whether the PSR's calculation of the base offense level is correct after considering properly included relevant conduct, (3) whether the Defendant's conduct warrants an offense level increase for certain specific offense characteristics pursuant to Chapter Two of the United States Sentencing Guidelines, (4) whether the Defendant's conduct warrants any adjustments pursuant to Chapter Three of the United States Sentencing Guidelines, and (5) whether the PSR's criminal history computation is correct.

## LEGAL STANDARD

When sentencing a defendant, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors." *Nelson v. United States*, 555 U.S. 350, 351 (2009) (citing 18 U.S.C. § 3553(a)); *see United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010) (citing *Nelson* and setting forth the two-step process that a sentencing court must engage in to determine a defendant's sentence). This Opinion and Order is intended to resolve the Defendant's objections related to the first step—the calculation of the Guidelines range.

Facts relevant to sentencing should be proved by a preponderance of the evidence, *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009); however, "any fact that increases the penalty of a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *United States v. Krieger*, 628 F.3d 857, 863 (7th Cir. 2010) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). The Federal Rules of Evidence do not apply to sentencing, *see United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005), and a court may rely on hearsay as long as the information "has sufficient indicia of reliability to

support its probable accuracy," *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (citations and quotation marks omitted). *See also United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) ("Sentencing judges necessarily have 'discretion to draw conclusions about the testimony given and evidence introduced at sentencing,' but 'due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.'" (quoting *England*, 555 F.3d at 622)). As such, "[a] district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *Rollins*, 544 F.3d at 838.

"The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and "[i]f he offers no evidence to question the PSR's accuracy, the court may rely on the PSR." *Id.* "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth." *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994). "Instead, beyond such a 'bare denial,' [the defendant] must produce some evidence that 'calls the reliability or correctness of the alleged facts into question.'" *Id.* (quoting *United States v. Isirov*, 986 F.2d 183, 186 (7th Cir. 1993)). However, it is the "Government's burden to prove by a preponderance of the evidence that [a particular] sentencing enhancement is warranted." *United States v. Hines*, 449 F.3d 808, 815–16 (7th Cir. 2006) (quoting *United States v. Ewing* 129 F.3d 430, 434 (7th Cir. 1997)).

## A.     Relevant Conduct

The Defendant, in his objections and his briefings, argues that the PSR contains irrelevant conduct that this Court may not consider during the sentencing process. Specifically, the Defendant argues that the Court cannot consider his past criminal activity, including the years of drug trafficking committed in connection with his involvement in the DTO, or the criminal

activities of other DTO members. That is not the case. *See United States v. Miller*, 834 F.3d 737, 742 (7th Cir. 2016).

"The case law is clear that the court may consider evidence of uncharged and acquitted conduct when determining a defendant's base offense level under § 1B1.3." *United States v. Freeman*, No. 07-CR-843, 2013 WL 1984412, at *12 (N.D. Ill. May 13, 2013) (citing *United States v. Watts*, 519 U.S. 148, 157 (1997)). In fact, the Sentencing Guidelines instruct sentencing courts to consider all relevant conduct. *See* U.S. Sentencing Guidelines Manual § 1B1.3 (U.S. Sentencing Comm'n 2018); *see also United States v. Taylor*, 272 F.3d 980, 982 (7th Cir. 2001). By requiring sentencing courts to consider all relevant conduct, the sentencing guideline's aim to include "relevant conduct in sentencing conditions is to allow the sentence to reflect the seriousness of an offense rather than being limited by the specific charge set out in the indictment." *Taylor*, 272 F.3d at 982. It is for that reason that "the guidelines permit the court to consider certain conduct with which the defendant has not been charged." *Id.*

Based on this principle, the Sentencing Guidelines range must be determined by considering a variety of conduct related to the defendant's conviction. Perhaps most straightforward, the sentencing court must consider "acts caused by the defendant which 'occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.'" *Id.* (citing U.S. Sentencing Guidelines Manual § 1B1.3). In the instant case, this will include all conduct related to the Defendant's possession of cocaine on February 3, 2015.

The Court may also consider the conduct of others for the purpose of sentencing if the offense involves a jointly undertaken criminal activity. Specifically, relevant conduct includes, unless instructed otherwise,

(B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

(i)    within the scope of the jointly undertaken criminal activity,

(ii)    in furtherance of that criminal activity, and

(iii)    reasonably foreseeable in connection with that criminal activity;

U.S. Sentencing Guidelines Manual § 1B1.3(a)(1) (U.S. Sentencing Comm'n 2018). This principle allows sentencing courts to hold a defendant accountable for acts that are "reasonably foreseeable to the defendant even though committed by others, that furthered a criminal activity that he had agreed to undertake jointly with those others." *United States v. Davison*, 761 F.3d 683, 685 (7th Cir. 2014) (citing *United States v. Soto–Piedra*, 525 F.3d 527, 531–33 (7th Cir. 2008); *United States v. McDuffy*, 90 F.3d 233, 236 (7th Cir. 1996); *United States v. Edwards*, 945 F.2d 1387, 1395 (7th Cir. 1991); *United States v. Spotted Elk*, 548 F.3d 641, 673–74 (8th Cir. 2008); U.S. Sentencing Guidelines Manual § 1B1.3 application n. 2, Illustrations (c)(1), (6), (7)). "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." U.S. Sentencing Guidelines Manual § 1B1.3 application n. 3(B) (U.S. Sentencing Comm'n 2018) "In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.*

The Court concludes that the DTO constitutes a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others. The PSR and the evidence introduced at trial indicates that the Defendant is intimately familiar with the jointly undertaken

criminal activity, including the source of drugs, the methods of packaging and delivery, the quantity of drugs and money trafficked, the individuals involved, and the premises utilized. *See* PSR ¶¶ 20–24. Based on the Defendant's intimate knowledge of the DTO and his conduct throughout his years of involvement with the DTO, the Court can determine the scope of the criminal activity. This scope includes Bates's regular receipt of controlled substances, specifically marijuana, cocaine, and heroin, from Mexico that were fronted to the Defendant for distribution. It also includes the Defendant selling the controlled substances and returning the drug proceeds to Bates, or to someone else involved in the DTO, for shipment to Mexico. Also included is the management of the supply chain, as the drugs and drug proceeds trafficked by the Defendant were processed through various shipment and storage premises. Finally, the scope includes the Defendant's actions to assist Bates, namely helping him escape to Mexico, recovering cocaine and drug proceeds from Lepper's pole barn, and collecting drug proceeds from the other DTO dealers. While this conclusion opens the door for the Court to consider the conduct of others, the Court must still conduct a separate analysis (and will do so in separate sections of this Opinion and Order) regarding whether a particular instance of conduct was in furtherance of the criminal activity and was foreseeable to the Defendant.

The Guidelines also instruct "that for offenses of a character for which § 3D1.2(d) would require grouping of multiple counts" a sentencing court must consider as relevant conduct "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Sykes*, 7 F.3d 1331, 1335 (7th Cir. 1993) (quoting U.S. Sentencing Guidelines Manual § 1B1.3(a)(2)) (internal quotation marks omitted); *see also United States v. Baines*, 777 F.3d 959, 963 (7th Cir. 2015) ("This 'relevant conduct' rule permits sentencing courts to consider additional quantities of drugs not specified in conviction, provided

'the unconvicted activities bore the necessary relation to the convicted offense.'" (quoting *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998))). To determine "whether offenses are part of the same course of conduct, we focus on 'whether the government has demonstrated a significant similarity, regularity, and temporal proximity.'" *Baines*, 777 F.3d at 963 (quoting *United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005) (internal quotation marks omitted)).

In the instant case, the record clearly demonstrates that the Defendant's participation in the DTO involved his continuous trafficking of marijuana, cocaine, and heroin that he obtained from Bates. The Court, based on the facts and data contained within the PSR, concludes that the Defendant's history of drug trafficking as a member of the DTO is of significant similarity, regularity, and temporal proximity to the instant offense and, therefore, is relevant conduct and must be considered during the sentencing process. Like the conduct of others involved in the jointly undertaken criminal activity, the Court will consider the Defendant's past actions in the following sections of the Opinion and Order.

**B.      Base Offense Level Calculation**

Applying these principals of relevant conduct, the Court calculates the Defendant's base offense level by using the Drug Quantity Table set forth in § 2D1.1(c). *See* U.S. Sentencing Guidelines Manual § 2D1.1(a)(5), (c) (U.S. Sentencing Comm'n 2018). The Drug Quantity Table prescribes a base offense level ranging from 6 to 38 contingent upon the type and quantity of controlled substances relevant to the offense. *Id.* at § 2D1.1(c). The Drug Quantity Table accounts for offenses involving the trafficking of numerous types of controlled substances by converting controlled substances to a converted drug weight and calculating the base offense level based on the converted weight. *Id.* at § 2D1.1 application n.8. Additionally, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall

12

approximate the quantity of the controlled substance." *Id.* at application n. 5. "In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." *Id.*

Whether a defendant is liable for illegal drug sales made by others involved in a jointly undertaken criminal activity "depends not only on whether the sale quantity was foreseeable to him . . . but also on whether he joined with those other conspirators in a joint undertaking of which the making of those sales was an objective, or had agreed to join in such an undertaking." *Davison*, 761 F.3d at 685–86.[3] "The government's burden in attributing drug quantities to a particular defendant does not require that it show that the defendant was involved in or even had direct knowledge of any particular transaction." *United States v. Seymour*, 519 F.3d 700, 711 (7th Cir. 2008) (citing *United States v. Hollins,* 498 F.3d 622, 630 (7th Cir. 2007)). Rather, "[r]easonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about." *Hollins*, 498 F.3d at 630 (quoting *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993)). "[A]lthough evidence of drug quantity must be more than speculative, 'nebulous eyeballing,' the sentencing guidelines permit *some* amount of reasoned 'speculation and reasonable estimation' by a sentencing court." *Id.* at 631 (quoting *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998)).

---

[3] Although the Defendant was not charged with conspiracy, the Court notes that most cases addressing issues of jointly undertaken criminal activity involve a charge of conspiracy to distribute controlled substances. The law is clear that the conduct of others involved in jointly undertaken criminal activity can be considered during sentencing, U.S. Sentencing Guidelines Manual § 1B1.3(a)(1) (U.S. Sentencing Comm'n 2018), and that, for sentencing purposes, sentencing courts can consider uncharged conduct, such as a conspiracy to distribute controlled substances, *see Freeman*, 2013 WL 1984412, at *12 (citing *Watts*, 519 U.S. at 157). Therefore, while these cases refer to coconspirators and conspiracies, they are still applicable to the instant case.

The PSR recommends a base offense level of 38 based on its determination that conduct relevant to the convicted offense involved trafficking 90,000 kilograms or more of converted drug weight. PSR at ¶ 40. Although the PSR indicates that a converted drug weight of more than 90,000 kilograms is supported by the overall drug quantities on the ledger and in the investigation as a whole, a breakdown as to which drugs were considered to reach this converted drug weight is not provided. *See id.* at ¶ 25. The Government raises no objection to this calculation. The Defendant does object, contending that the drugs he sold prior to February 3, 2015, and the drugs sold by the other members of the DTO are not relevant for sentencing purposes. Def.'s Objections ¶¶ 28, 40. Essentially, the Defendant argues that the Court can only consider the cocaine collected on February 3, 2015, and his drug debt when determining the base offense level and, therefore, the evidence only supports a drug weight of 41 kilograms resulting in a base offense level of 32. *Id.* at ¶ 40.

The Defendant's assertion is contrary to the well-established law of this Circuit. As previously explained, the conduct relevant to sentencing includes the Defendant's past conduct—assuming it is part of the same course of conduct or common scheme or plan as the offense—and the conduct of others involved in the jointly undertaken criminal activity. The Court has already concluded that the Defendant's past drug trafficking activities fall within the same course of conduct or common scheme or plan as the instant offense; therefore, such conduct must be considered during sentencing.

Whether the conduct of others can be considered is less straightforward, as the criteria detailed under § 1B1.3(a)(1)(B) must be meet. Of course, the sale of controlled substances falls within the scope of, and naturally furthers, this jointly undertaken criminal activity. Further, the drug sales of the other members of the DTO were likely foreseeable to the Defendant. However,

the Seventh Circuit has indicated that the Defendant must commit an additional affirmative act before the drug sales of others can be considered relevant conduct. *See Davison*, 761 F.3d at 686 ("If he neither did nor agreed to do anything to promote sales by the other gang members, their sales (which together with his sales exceeded the 8.4 kilogram limit for a sentence reduction) were not relevant conduct of his, even if foreseeable."). For the most part, it seems that the Defendant did not make any such affirmative actions. The Government argues that the Defendant delivered drugs to the other dealers throughout his involvement with the DTO; however, that assertion is inconsistent with Bates's testimony at trial. Nevertheless, it is clear that, for the week after Bates escaped to Mexico on January 27, 2015, PSR ¶¶ 8, 20, the Defendant met with the other dealers to retrieve drug proceeds during that time period. This affirmative act demonstrates that the Defendant joined those particular instances of criminal conduct and had direct knowledge those drug sales. As such, those drug proceeds will be included in the Defendant's converted drug weight.

Based on the above, the law supports the Defendant being held accountable for (1) the drugs and drug proceeds he possessed on February 3, 2015, (2) the drugs he trafficked as a member of the DTO, and (3) the drugs trafficked by others in the jointly undertaken criminal activity, but only to the extent he joined or agreed to join such an undertaking.

First, a review of the record indicates that the following established quantities of drugs and drug proceeds can be considered by the Court to determine the converted drug weight for the Defendant's offense:

- $80,000 in drug proceeds seized from Norton's car on November 7, 2014;

- $100,000 in drug proceeds delivered to Bates by the Defendant;

- $60,000 in drug proceeds recovered by the Defendant from Lepper's pole barn on February 1, 2015, and taken by Cook;

- $2,089,000 in drug proceeds recovered by law enforcement during the February 3, 2015 search of the Defendant's hotel room (which includes the drug proceeds the Defendant collected from the other DTO dealers while Bates was in Mexico);

- 19.8 kilograms of cocaine recovered by law enforcement during the February 3, 2015 search of the Defendant's hotel room,

- $730,000 of drug debt owed by the Defendant as recorded in Bates's drug ledger.

During trial, Bates testified that a kilogram of cocaine sold for $37,500. *See* Tr. Transcript Oct. 10, 2018 at 157. Converting the above-listed drug proceeds to cocaine results in the following quantities:

- $80,000 = 2.133 kilograms of cocaine;

- $100,000 = 2.666 kilograms of cocaine;

- $60,000 = 1.600 kilograms of cocaine;

- $2,089,000 = 55.706 kilograms of cocaine;

- $730,000 = 19.466 kilograms of cocaine.

These amounts, plus the 19.8 kilograms of cocaine seized from the hotel room, equates to 101.371 kilograms of cocaine, or a converted drug weight of 20,274.2 kilograms.

Second, the Defendant is accountable for trafficking an unspecified amount of marijuana, cocaine, and heroin between 2009 or 2010 and 2015. As the Court is allowed to reasonably approximate the quantity of drugs sold, the Court concludes, based on the evidence presented at trial and contained within the PSR, that the Defendant trafficked a total (including the 20,274.2

kilograms itemized above) of at least 30,000 kilograms but less than 90,000 kilograms of converted drug weight.

Although an exact quantity of drugs sold by the Defendant was not provided for the time period between 2009 or 2010 and 2015, Bates testified that the Defendant was one of his best dealers and would sometimes take 15 to 20 kilograms at a time to sell to his customers in Indianapolis. *See* Tr. Transcript Oct. 10, 2018 at 155–56. Based on this testimony, it is apparent that the Defendant trafficked a substantial quantity of controlled substances, as he was one of the top dealers in Bates's large-scale DTO, which had connections to Mexico, operated in several states, and generated millions of dollars by trafficking controlled substances. In November and December 2014 alone, the Defendant delivered at least $180,000 of drug proceeds (as detailed above), *see id*. at ¶¶ 5, 6, which equates to just under 5 kilograms of cocaine. This information, paired with Bates's testimony, suggests sales of approximately 150 kilograms (5 kilos every two months) of cocaine by the Defendant from 2010 to 2015. These sales total 30,000 kilograms of converted drug weight. The 30,000 kilograms of converted drug weight along with the 20,274.2 kilograms itemized above, equates to 50,274.2 kilograms of converted drugs weight.

The Court is, however, unwilling to conclude, as the PSR and Government recommend, that the Defendant trafficked 90,000 kilograms or more of converted drug weight. Such a finding would require the Court to conclude that the Defendant trafficked approximately 69,725.8 kilograms of converted drug weight, or 198.629 kilograms of cocaine, between 2009 or 2010 and 2015, when the evidence only supports that the Defendant trafficked approximately 30,000 converted kilos (or 150 kilograms of cocaine) between those years.  The Government has failed to provide enough evidence to allow the Court to reach such a conclusion. As such, the Court concludes that a converted drug weight of at least 30,000 kilograms but less than 90,000

kilograms is supported by the evidence presented at trial and contained within the PSR, resulting in a base offense level of 36, rather than 38.

## C.     Specific Characteristics of the Offense

The offense level for a conviction under 21 U.S.C. § 841(a)(1) can be increased or decreased based on the specific offense characteristics as outlined in § 2D1.1(b) of the Sentencing Guidelines. *See* U.S. Sentencing Guidelines Manual § 2D1.1(b) (U.S. Sentencing Comm'n 2018). The PSR increases the Defendant's offense level by two points pursuant to § 2D1.1(b)(1) for the possession of a dangerous weapon and by two points pursuant to § 2D1.1(b)(2) for the use of violence. PSR at ¶ 41, 42.

The Government does not object to the PSR's assessment of upward adjustments pursuant to § 2D1.1(b)(1) or (2). The Government does, however, object to the PSR's omission of a two-point upward adjustment pursuant to § 2D1.1(b)(12) for the maintenance of a drug premises. Gov't's Objections 1. The Defendant objects to the upward adjustments assessed pursuant to § 2D1.1(b)(1) and (2) and argues that there is no evidence of relevant conduct supporting an upward adjustment under either section of the Guidelines. Def.'s Objections to Draft Presentence Report at ¶¶ 41, 42. The Defendant did not file a response to the Government's objections and thus never addressed the assessment of an upward adjustment pursuant to § 2D1.1(b)(12). The Court considers each adjustment in turn.

### 1.     *Possession of a Dangerous Weapon*

Section 2D1.1(b)(1) of the Sentencing Guidelines instructs sentencing courts to increase the base offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (U.S. Sentencing Comm'n 2018). The Defendant objects to the PSR's application of § 2D1.1(b)(1), arguing that no evidence, or at

least no reliable evidence, was presented that he was armed during the offense and that the possession of firearms by other members of the DTO is irrelevant to his sentencing. Def's Objections ¶¶ 29, 41.

The Defendant's assertion that he was unarmed, even if assumed to be true, does not preclude the two-point offense level increase under § 2D1.1(b)(1). This is because, "[a]lthough U.S.S.G. §2D1.1(b)(1) appears to penalize only those defendants who actually possess a firearm in the course of committing a drug offense, section 1B1.3(a)(1)(B) makes clear that defendants can also be on the hook for firearms possessed by their coconspirators so long as such possession was reasonably foreseeable." *United States v. Luster*, 480 F.3d 551, 558 (7th Cir. 2007); *see also United States v. Mumford*, 25 F.3d 461, 468 (7th Cir. 1994) ("[D]istrict courts must no longer limit their review to the evidence dealing with the proximity of the firearm and the drugs at the specific time of the offense of conviction . . . but may appropriately apply the same analysis as if the defendant were convicted of the conspiracy." (citing *United States v. Cantero*, 955 F.2d 1407, 1412 (7th Cir. 1993))). "To apply the firearm enhancement to a defendant who did not personally possess a gun (or have actual knowledge of a coconspirator's gun possession), the judge must make two findings by a preponderance of the evidence: (1) that someone in the conspiracy actually possessed a firearm in furtherance of the conspiracy, and (2) that the firearm possession was reasonably foreseeable to the defendant." *United States v. Ramirez*, 783 F.3d 687, 690 (7th Cir. 2015) (citing *Luster*, 480 F.3d at 558).

It is generally not difficult for the Government to prove that a firearm was possessed in furtherance of the jointly undertaken criminal activity, "as firearms found in close proximity to illegal drugs create a presumption that they are possessed in connection with the drug offense." *Luster*, 480 F.3d at 558 (citing *United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001)).

Further, the Government is not required to show that the defendant or another involved in the jointly undertaken criminal activity physically possessed a dangerous weapon; indeed, the seizure of firearms hidden at a residence that is used in connection with drug trafficking will trigger the application of § 2D1.1(b)(1). *See, e.g.*, *Ramirez*, 783 F.3d at 690; *United States v. Garcia*, 925 F.2d 170, 173–74 (7th Cir. 1991) (applying § 2D1.1(b)(1) to a defendant who kept a hidden firearm in the house used for his drug trafficking operation and listing cases where § 2D1.1(b)(1) was applied under similar circumstances); *see also Mumford*, 25 F.3d at 468 ("We conclude that the enhancement for weapons possession is applicable where the defendant is accountable for the possession of a weapon by a co-conspirator during drug trafficking conduct relevant to the offense of conviction . . . , even where the weapon was not present during the offense of conviction.").

To determine whether the firearm possession was reasonably foreseeable to the defendant, the sentencing judge must "undertake an individualized inquiry about the foreseeability of the coconspirators' gun possession from the perspective of the defendant." *Ramirez*, 783 F.3d at 691 (citing *United States v. Vold*, 66 F.3d 915, 921 (7th Cir. 1995)). A defendant's presence where the weapons were stored paired with his or her knowledge of the scale of the drug trafficking operation will "raise the inference that [the defendant] could have reasonably foreseen [his or her] coconspirator's possession of firearms for intimidation or protection." *Luster*, 480 F.3d at 558 (citing *Cantero*, 995 F.2d at 1412). The Seventh Circuit has said that "the drug industry is by nature dangerous and violent, and a reasonable fact-finder is permitted to use his or her common sense in concluding that in a drug deal involving sizable amounts of money, the presence of firearms is foreseeable." *Ramirez*, 783 F.3d at 690–91 (quoting *United States v. Berchiolly*, 67 F.3d 634, 640 (7th Cir. 1995)); *see also United States v.*

*Banks*, 987 F.2d 463, 467–68 (7th Cir. 1993) ("Since guns are tools of the drug trade, it was reasonably foreseeable that [a co-participant] would possess one during the offense."). It is important to recognize that, while the Court is "permitted to consider the practical reality of the drug trafficking industry in determining whether the possession of firearms by other members of a conspiracy is reasonably foreseeable to the particular defendant," common sense assumptions cannot alone satisfy the foreseeability requirement. *United States v. Block*, 705 F.3d 755, 764 (7th Cir. 2013) (citing *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009); *Berchiolly*, 67 F.3d at 640; *Vold*, 66 F.3d at 921).

Based on the Defendant's written objections, he does not appear to dispute that firearms were possessed in furtherance of the jointly undertaken criminal activity, and to do so would be futile. The PSR details that "there were multiple firearms possessed throughout the jointly undertaken criminal activity," that "Bates identified the [D]efendant as consistently being armed," and that several of the other DTO members, including Bates, "were documented to be in possession of multiple firearms." PSR at ¶ 29. The PSR also notes that law enforcement seized "multiple firearms, including rifles, shotguns, pistols, and assault rifles with ammunition" at the pole barn where drugs, money, and drug trafficking equipment were stored, *see id.* at ¶ 7, as well as "three loaded pistols" at the Richfield Lane residence, *see id.* at ¶ 8.

Furthermore, the Defendant's written objections do not seem to dispute that the firearm possession of other DTO members was foreseeable to him. Again, suggesting otherwise would be contrary to the facts of the instant case. The facts and details contained in the PSR indicate that the Defendant participated in the Bates Organization from 2009 or 2010 to 2015, was familiar with the inner workings of the DTO, was familiar with the members of the DTO, and was familiar with and visited the premises, or at least a subset of the premises, utilized by the

DTO. In addition, the Defendant was certainly aware of the practical realities of the drug trade due to his tenure in the DTO. Due to the Defendant's involvement in and intimate knowledge of the DTO paired with the nature of the DTO—i.e. the volume of drugs trafficked, the amount of money involved, and the DTO's connection to drug trafficking in Mexico—the possession of firearms, or any other weapon, by others involved in the jointly undertaken criminal activity was foreseeable to the Defendant. The Defendant's objections seem to affirm this conclusion, as he openly admits that other members of the DTO possessed firearms. Def.'s Objections ¶ 6. For these reasons, the Court concludes that a two point increase pursuant to § 2D1.1(b)(1) is warranted.

### 2.     *Use of Violence*

Section 2D1.1(b)(2) of the Sentencing Guidelines instructs sentencing courts to increase the base offense level by two levels "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." U.S. Sentencing Guidelines Manual § 2D1.1(b)(2) (U.S. Sentencing Comm'n 2018). As explained in Section A above, the violent conduct of others will be attributed to the Defendant so long as it was "(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." U.S. Sentencing Guidelines Manual § 1B1.3 (U.S. Sentencing Comm'n 2018).

The PSR relies on information provided by Bates to conclude that the Defendant committed acts of violence that warrant the application of § 2D1.1(b)(2). PSR at ¶ 26. Specifically, the PSR states that the Defendant provided transportation to two individuals, whom he knew were going to commit homicide, to and from the location of the murder and subsequently disposed of the murder weapons. PSR at ¶ 26. In addition, the PSR states that the

Defendant himself committed a drug related homicide. PSR at ¶ 26. The PSR indicates that both homicides were perpetrated for the benefit of the DTO. PSR at ¶ 26. The Government expresses no objection to increasing the offense level pursuant to § 2D1.1(b)(2). The Defendant objects by both denying that he killed any person at any time and arguing that the conduct of other members of the Bates Organization is not relevant to his sentencing. PSR at ¶¶ 26, 30.

The facts and details contained within the PSR concerning violent conduct, if true, would demand the application of § 2D1.1(b)(2). Sentencing courts are permitted to rely on information contained within the PSR, but only if the facts in the PSR are based on sufficiently reliable information. *Rollins*, 544 F.3d at 838. The PSR indicates that Bates provided the information used to assess the adjustment pursuant to § 2D1.1(b)(2). However, the specifics of how and when this information was obtained is not included in the PSR. Unlike the other information provided by Bates that is utilized throughout the PSR, there is no indication that this information was introduced at trial or any prior hearing. Additionally, there is no indication that Bates was under oath when he provided this information.

The Government had the opportunity to introduce this information in a manner that would establish it as sufficiently reliable. For example, the Government could have asked Bates about the Defendant's alleged violent conduct during trial. Alternatively, the Government could have requested a sentencing hearing for the purposes of introducing this information. Either would have required Bates to testify under oath, given the Defendant an opportunity to cross-examine Bates, and allowed the Court to assess the credibility of Bates's testimony. However, as it stands, the information in the PSR does not reach the reliability threshold required by law; therefore, based on this record, the Court concludes that an upward adjustment pursuant to § 2D1.1(b)(2) is not warranted.

### 3. *Maintenance of a Drug Premises*

Section 2D1.1(b)(12) of the Sentencing Guidelines instructs sentencing courts to increase the base offense level by two levels for maintaining "a premises for the purpose of manufacturing or distributing a controlled substance." U.S. Sentencing Guidelines Manual § 2D1.1(b)(12) (U.S. Sentencing Comm'n 2018). The specific offense characteristic "applies to a defendant who knowingly maintains a premises (i.e. a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." *Id.* at application n.17. "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.*

The Government's sole objection to the PSR is that the Defendant's offense level should be increased by an additional two levels pursuant to § 2D1.1(b)(12) because the evidence supports the Defendant's "complicity in jointly undertaking the use of multiple drug stash houses." Gov't's Objection. The Defendant did not respond to the Government's objection.

There are relatively few cases addressing the applicability of § 2D1.1(b)(12), let alone cases on the application of § 1B1.3 to § 2D1.1(b)(12). The Court is aware of three such cases; *United States v. Miller*, *United States v. Holmes*, and *United States v. Austin*. In *United States v. Miller*, the Eighth Circuit "assume[d] that § 2D1.1(b)(12), like the 21 U.S.C. § 856(a)(1) offense that it parallels, requires proof that the specific defendant being sentenced maintained the premises 'for the purpose of' drug manufacture or distribution." 698 F.3d 699, 706 (8th Cir. 2012). The court explained that "[i]t is not sufficient that others possess the requisite purpose." *Id.* (quoting *United States v. Payton,* 636 F.3d 1027, 1043 (8th Cir. 2011)). In contrast, in *United*

*States v. Holmes*, the Eleventh Circuit observed that "[n]othing in § 2D1.1(b)(12) prohibits a

sentencing court from imposing the premises enhancement based on the jointly undertaken

criminal activity of co-conspirators" and that, unlike other sections of the guidelines where

jointly undertaken criminal activity cannot be considered during sentencing, "§ 2D1.1(b)(12)

lacks an application note limiting the effect of § 1B1.3(a)(1)(B)." 767 F. App'x 831, 838–39

(11th Cir. 2019) (comparing § 2D1.1(b)(12) with § 3C1.2). In *United States v. Austin*, the Sixth

Circuit recognized the existence of a circuit split on this particular issue, but ultimately resolved

the case without opining on the issue. 2019 WL 6954342, at *10, — F. App'x —, — (6th Cir.

Dec. 19, 2019). The Court is not aware of any case where the Seventh Circuit has considered this

issue.

The Court is persuaded by the Eleventh Circuit's approach that a sentencing court may

consider the conduct of others involved in jointly undertaken criminal activity when determining

whether § 2D1.1(b)(12) is applicable. Notably the language of § 2D1.1(b)(12) mirrors the

language of other Specific Offense Characteristics listed under § 2D1.1(b). Section 2D1.1(b)(12)

specifically states: "If the defendant maintained a premises for the purpose of manufacturing or

distributing a controlled substance, increase by **2** levels." U.S. Sentencing Guidelines Manual §

2D1.1(b)(12) (U.S. Sentencing Comm'n 2018). This section is phrased almost identically to, for

example, Section 2D1.1(b)(2): "If the defendant used violence, made a credible threat to use

violence, or directed the use of violence, increase by **2** levels," *id.* at § 2D1.1(b)(2), which, as

confirmed by the Seventh Circuit, can be invoked based on the actions of others involved in the

jointly undertaken criminal activity, *see United States v. Ramirez-Mendoza*, 683 F.3d 771, 776

(7th Cir. 2012). Furthermore, the plain text reading of the Sentencing Guiltiness clearly instructs

that "*[u]nless otherwise specified*, . . . specific offense characteristics . . . shall be determined on

the basis of . . . in the case of a jointly undertaken criminal activity . . . all acts and omissions of others . . . ." U.S. Sentencing Guidelines Manual § 1B1.3 (U.S. Sentencing Comm'n 2018) (emphasis added). Because no application note limits the scope of § 2D1.1(b)(12), the Court concludes that it is appropriate to consider the actions of others, assuming the criteria of § 1B1.3(a)(1)(B) have been met, when determining whether § 2D1.1(b)(12) applies. Therefore, a defendant is accountable for a drug premises maintained by others involved in the jointly undertaken criminal activity, so long as the premises was maintained "(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." *See* U.S. Sentencing Guidelines Manual § 1B1.3 (U.S. Sentencing Comm'n 2018).

The PSR did not consider whether the instant offense warranted an offense level increase pursuant to § 2D1.1(b)(12); however, it provided multiple examples of locations that were used by the DTO's members. Specifically, the PSR mentions at least four: Lepper's pole barn in Butler, Indiana, PSR ¶¶ 4,7; Lepper's warehouse in Angola, Indiana, *id.* at ¶ 4; the Treverton Drive residence in Fort Wayne, Indiana, *id.* at ¶ 6; and the Richfield Lane residence in Fort Wayne, Indiana, *id.* at ¶ 8. To determine whether a premises that also serves as a primary residence—such as the Treverton Drive and Richfield Lane residences—is maintained for the purpose of manufacturing or distributing a controlled substance, a separate analysis is required. *See United States v. Flores-Olague*, 717 F.3d 526, 532 (7th Cir. 2013). However, such an analysis is unnecessary because the PSR's description of both Lepper's pole barn and warehouse clearly indicate that both premises were maintained primarily for the distribution of controlled substances. *See* PSR ¶¶ 4, 7.

Based on the PSR, Lepper's pole barn and warehouse were maintained as storage and shipping points for the DTO. This fact makes it clear that Lepper's pole barn and warehouse were maintained within the scope of the jointly undertaken criminal activity (drug trafficking) and they were maintained in furtherance of the criminal activity. Further, because the Defendant was aware of the nature and scale of the DTO, the maintenance of these premises was foreseeable, as such a large-scale organization would require locations to store drugs, money, and other drug paraphernalia. The fact that the Defendant retrieved cocaine and money from Lepper's pole barn strengthens the Court's conclusion, as it shows that the Defendant elected to continue his involvement in the criminal activity even after being made aware that the DTO maintained a drug premises. For these reasons, a two-point increase to the Defendant's offense level pursuant to § 2D1.1(b)(12) is warranted.

**D.     Applicable Adjustments**

The offense level for a criminal conviction can be further adjusted by a number of aggravating or mitigating factors as detailed in Chapter Three of the Sentencing Guidelines. The PSR details two aggravating factors warranting an upward adjustment of the Defendant's offense level: (1) the Defendant's role in the offense and (2) the Defendant's obstruction of the administration of justice. The PSR further details that a third adjustment, the Defendant's acceptance of responsibility, is not appropriate in the instant case. The Government raises no objections to the PSR's recommendations. The Defendant objects to the application of the upward adjustments, arguing that they are not supported by the evidence. The Defendant also contends that he has shown an acceptance of responsibility for the committed offense and objects to the PSR's failure to apply the downward adjustment.

## 1.    *Role in the Offense*[4]

Section 3B1.1(a) permits a sentencing court to increase a defendant's offense level by two to four levels for playing an aggravating role in a criminal enterprise. Sentencing Guidelines Manual § 3B1.1 (U.S. Sentencing Comm'n 2018). The PSR recommends that the Defendant receive a four-level upward adjustment pursuant to § 3B1.1(a) for serving as an organizer or leader of the DTO. PSR ¶ 44.

Section 3B1.1 does not define who should be considered an organizer or leader; rather, it outlines the following seven factors for sentencing courts to consider when assessing a particular defendant's involvement in the criminal activity:

> 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority exercised over others.

*Mustread*, 42 F.3d at 1104 (citing Sentencing Guidelines Manual § 3B1.1 application n.4). Although the Sentencing Guidelines instruct that these factors are to be used to distinguish "a leadership and organizational role from one of mere management or supervision," Sentencing Guidelines Manual § 3B1.1 application n.4 (U.S. Sentencing Comm'n 2018), sentencing courts have also used them to determine whether the defendant played an aggravating role, *see United States v. Bennett*, 708 F.3d 879, 891 (7th Cir. 2013) (citing cases from other circuits using the application note four factors to determine whether the defendant played an aggravating role in the offense).

---

[4] The Court notes that in its April 24, 2019 Opinion and Order the Court concluded that "Bate's testimony shows, beyond a reasonable doubt, that the Defendant was in charge of the operation after Bates's departure to Mexico." April 24, 2019 Opinion and Order 14, ECF No. 438. However, the Court's analysis did not consider § 3B1.1 of the Sentencing Guidelines; therefore, an analysis to determine whether the Defendant was an organizer, leader, supervisor, or manager is still necessary.

Although each factor may (and should) be considered, the factors are not dispositive and are not to be weighted equally. *Mustread*, 42 F.3d at 1104. Ultimately, the sentencing court's "primary goal in applying § 3B1.1 should be to make a 'commonsense judgment about the defendant's relative culpability given [the defendant's] status in the criminal hierarchy.'" *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015)); *see also United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012) ("Thus, we held in *Figueroa* that a manger or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." (citing *United States v. Figueroa*, 682 F.3d 694, 697–98 (7th Cir. 2012))). Indeed, the Seventh Circuit has instructed that "slavish adherence to [the factors] is unnecessary," *Bennett*, 708 F.3d at 891 (quoting *Mustread*, 42 F.3d at 1104 n.3), and that the key inquiry of the sentencing court's analysis should be "whether the defendant exercised some control over at least one other participant," *Mustread*, 42 F.3d at 1104 (citing *United States v. Brown*, 994 F.2d 1377, 1381 (7th Cir. 1991)); *see also Figueroa*, 682 F.3d at 697 ("If a judge, a probation officer, a lawyer, even a defendant, doesn't know what a 'manager' or 'supervisor' is, Application Note 4 isn't going to help him."). For the purposes of § 3B1.1, "a defendant exercises control and authority over another when [the defendant] 'tells people what to do and determines whether they've done it.'" *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013) (quoting *Figueroa*, 682 F.3d at 697). The Seventh Circuit has also instructed that "[i]t is sufficient that the defendant orchestrated or coordinated the activities of others." *United States v. Gracia*, 272 F.3d 866, 877 (7th Cir. 2001) (citing *United States v. Fones*, 51 F.3d 663, 666 (7th Cir. 1995)). However, the application of § 3B1.1 "requires ongoing supervision, not a one-off request from one equal to another during the course of the criminal activity." *Weaver*, 716 F.3d at 444 (citing *Figueroa*, 682 F.3d at 697–98).

The PSR indicates that this adjustment was applied because the Defendant took over for Bates after he fled to Mexico. PSR ¶ 31. The Government does not object to the application of this adjustment. In its briefs, the Government contends that the Defendant "took over Bates's former role of coordinating and organizing the conspiracy's activities in the United States" and advances several arguments as to why this adjustment should apply to the Defendant. Gov't's Mot. to Strike and Resp. Br. 4–5, ECF 458. The Defendant argues that he was not a leader of the organization and that he was solely acting under the direction of Bates while Bates was in Mexico. Def.'s Objections ¶¶ 10, 11, 31, 44.

As previously explained, the critical inquiry a sentencing court must make when determining if § 3B1.1 applies to a particular defendant is "whether the defendant exercised some control over at least one other participant," *Mustread*, 42 F.3d at 1104 (citing *Brown*, 944 F.2d at 1381). Merely trafficking drugs, regardless of type or quantity, will not warrant the application of § 3B1.1. *See Weaver*, 716 F.3d at 444 ("Yet '[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer." (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994))).

In the instant case, there is no evidence that the Defendant exercised authority or control over anyone. It is true that the Defendant collected money from the other DTO dealers and, in doing so, directed them to meet him at various drop-off points. However, this is merely a one-off request from one equal to another during the course of the criminal activity and, as such, does not establish ongoing supervision and control. *See Weaver*, 716 F.3d at 444 (citing *Figueroa*, 682 F.3d at 697–98). Further, many of the § 3B1.1 note four factors are absent. There is no evidence

to suggest that the Defendant held any significant decisionmaking authority, recruited accomplices, claimed a larger share of the fruits of the crime, or held any control or authority over the other members of the DTO. The evidence suggests that the Defendant was acting as an extension of Bates while he was in Mexico. The Defendant was in frequent communication with Bates and carried out tasks at his direction—such as meeting with members of the organization and collecting the cocaine and money missed during the law enforcement sweep of the pole barn in Butler, Indiana. PSR at ¶¶ 10, 18, 22.

It is conceivable that Bates was grooming the Defendant to take a leadership position in the DTO due to his absence and, perhaps, if offered the opportunity, the Defendant would have risen to the occasion. However, the evidence does not suggest that the mantel was passed from Bates to the Defendant during the one-week period between Bates's escape to Mexico and the Defendant's arrest. The Court recognizes the extent and severity of the Defendant's conduct; however, the appropriate punishment for the Defendant's conduct is achieved through other provisions of the Sentencing Guidelines. There is no evidence clearly demonstrating that the Defendant engaged in affirmative actions organizing, leading, supervising, or managing the DTO; therefore, an adjustment under § 3B1.1 is not warranted.

### 2. *Obstruction of the Administration of Justice*

Section 3C1.1 of the Sentencing Guidelines provides for an adjustment to a defendant's offense level if the defendant obstructed the administration of justice. Specifically, § 3C1.1 provides the following instruction to sentencing courts:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S. Sentencing Guidelines Manual § 3C1.1 (U.S. Sentencing Comm'n 2018). Under § 3C1.1, "the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* § 3C1.1 application n.9.

The PSR recommends an upward adjustment to the Defendant's offense level pursuant to § 3C1.1 because the Defendant destroyed his cell phone and Bates's drug ledger prior to his arrest and the Defendant violated the Court's protective order regarding his discovery materials. PSR ¶ 35. The Government does not object to this recommendation. However, the Government provides a third example of obstructive conduct: The aid the Defendant provided Bates during his escape to Mexico. Gov't's Mot. to Strike and Resp. Br. at 6–7. The Defendant objects to the adjustment by arguing that the destruction of his phone and Bates's drug ledger does not amount to an obstruction of justice because it did not result in a material hindrance to the Government's investigation or prosecution and by denying that he violated the Court's protective order. Def.'s Objections ¶¶ 14, 17, 18, 23, 26, 35, 38, 45.

The Court notes that either the destruction of the phone and drug ledger or the violation of the Court's protective order may mandate a § 3C1.1 adjustment. However, the case law as well as the facts detailed in the PSR make it unclear, without substantial analysis or an additional hearing, whether either is sufficient to invoke the adjustment.[5]

---

[5] The Court notes several issues that arise when considering whether the adjustment is warranted due to the Defendant destroying his cell phone and Bates's drug ledger prior to his arrest or the Defendant violating the Court's protective order regarding his discovery materials. In regard to the destruction of the cell phone and drug ledger, the Court recognizes that the destruction or concealment of "evidence that is material to an official investigation or judicial proceeding" will warrant the application of the adjustment; "however, if such conduct occurred contemporaneously with arrest . . . , it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender." U.S. Sentencing Guidelines Manual § 3C1.1 application n.4(D) (U.S. Sentencing Comm'n 2018). The Government and the Defendant agree that the Defendant destroyed the phone and drug ledger

Notwithstanding this possibility, the Court finds that the aid the Defendant provided Bates during his escape to Mexico warrants a § 3C1.1 adjustment; thus, the Court need not consider the other conduct cited in the PSR and will focus its analysis accordingly.

Typically, flight is not considered an obstruction of the administration of justice under § 3C1.1. *See* U.S. Sentencing Guidelines Manual § 3C1.1 application.n.5(D) (U.S. Sentencing Comm'n 2018). However, the Seventh Circuit has "distinguished between 'panicked, instinctive flight,' generally in the immediate aftermath of the crime, and 'calculated evasion' constituting a deliberate attempt to frustrate or impede an ongoing criminal investigation." *United States v. Cisneros*, 846 F.3d 972, 975 (7th Cir. 2017) (citing *United States v. Schwanke*, 694 F.3d 894, 897 (7th Cir. 2012); *United States v. Gonzalez*, 608 F.3d 1001, 1006–07 (7th Cir. 2010); *United States v. Arceo*, 535 F.3d 679, 687 (7th Cir. 2008)). When determining whether flight warrants the application of § 3C1.1, the sentencing court must determine "whether the flight is 'likely to burden a criminal investigation or prosecution significantly—likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been.'" *Id.* (quoting *United States v. Nduribe*, 703 F.3d 1049, 1053 (7th Cir. 2013)). The Seventh Circuit has repeatedly held that flight involving "trave[l] to a foreign country

---

but disagree as to whether the items were destroyed contemporaneously with arrest. Neither party has provided a clear definition as to what constitutes "contemporaneously with arrest," and it does not appear that the Seventh Circuit has opined on the issue in relation to § 3C1.1 *C.f. United States v. Welshans*, 892 F.3d 566, 578–81 (3rd Cir. 2018) (outlining the different interpretations of "contemporaneously with arrest"). In regard to the violation of the protective order, the Court recognizes that such conduct may warrant an adjustment under § 3C1.1. *See United States v. Callaso*, 735 F. App'x 214, 215–17 (7th Cir. 2018). The PSR states that "the government has received information from another cooperator that Lewis has been selling views of his discovery materials to other inmates in violation of the Court's protective order." PSR ¶ 26. Although this conduct, if it occurred, may warrant the adjustment, it is unclear whether this portion of the PSR is based on sufficiently reliable information. *See, e.g.*, *Rollins*, 544 F.3d at 838; *see also Callaso*, 735 F. App'x at 218 (holding that testimony and social media screenshots were sufficient to support the Government's allegations that the defendant violated the court's protective order). Since there is other conduct that demands the application of the adjustment, the Court will forego addressing these issues.

where the authorities will have significant difficulty in finding and apprehending the defendant" warrants the application of the § 3C1.1 adjustment. *Id.*; *see also Nduribe*, 703 F.3d at 1053; *Schwanke*, 694 F.3d at 895; *Arceo*, 535 F.3d at 687.

On January 27, 2015, law enforcement unsuccessfully attempted to arrest Bates. PSR at ¶ 8. After Bates escaped law enforcement by leading officers on a high-speed vehicle pursuit, *see id.*, the Defendant drove him to the United States-Mexico border and dropped him off in McAllen, Texas, *see id.* at ¶ 20. This is an example of a calculated evasion that was deliberately executed to avoid arrest and impede the ongoing criminal investigation of the DTO. The Defendant's actions did, in fact, result in frustrating the investigation and prosecution of the DTO, as federal agents were required to expend time and government resources to extract Bates from Mexico, which ultimately delayed his arrest. Therefore, this escape to Texas, and eventually Mexico, is the type of flight that warrants the application of § 3C1.1. *See Nduribe*, 703 F.3d at 1053.

As previously explained, under § 3C1.1, the Defendant is accountable for conduct that he aided or abetted; therefore, the Court must consider the role the Defendant played in Bates's escape to Mexico. U.S. Sentencing Guidelines Manual § 3C1.1 cmt. n.4 (U.S. Sentencing Comm'n 2018). For the reasons detailed above, the Court concludes that the Defendant's conduct warrants a two-point increase to the Defendant's offense level. *See Nduribe*, 703 F.3d at 1053.

The Government also argues, in a footnote, that the Defendant's offense itself constitutes an obstruction of justice because it involves concealing evidence that was subject to an ongoing investigation. Gov't Mot. Strike & Resp. Br. 7 n.1. The Seventh Circuit has held that an individual has obstructed justice if he or she conceals evidence of

a crime after being put on notice that a criminal investigation is in progress. *See United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994); *Brown*, 944 F.2d at 1383. Applying this principle yields an additional basis for a § 3C1.1 adjustment because the Defendant, at the direction of Bates, concealed or attempted to conceal evidence, such as the cocaine and money from Lepper's pole barn and Bates's drug leger, all of which constitute evidence that was essential to the investigation and prosecution of the DTO.

### 3.      *Acceptance of Responsibility*

Section 3E1.1 of the Sentencing Guidelines provides for an adjustment to a defendant's offense level based on the defendant's acceptance of responsibility for the offense. Specifically, § 3E1.1 instructs sentencing courts to decrease the offense level by two levels "if the defendant clearly demonstrates acceptance of responsibility for his offense." U.S. Sentencing Guidelines Manual § 3E1.1 (U.S. Sentencing Comm'n 2018).

"Ordinarily a defendant who chooses to go to trial and force the government to prove his guilt is not eligible to receive a sentence reeducation for acceptance of responsibility." *United States v. Williams*, 202 F.3d 959, 962 (7th Cir. 2000) (citing U.S. Sentencing Guidelines Manual § 3E1.1 application n.2). Indeed, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt." U.S. Sentencing Guidelines Manual § 3E1.1 application n.2 (U.S. Sentencing Comm'n 2018). There is an exception for defendants who proceed to trial to challenge an issue aside from factual guilt, such as the constitutionality of a statue. *Williams*, 202 F.3d at 962 (citing *United States v. Bonanno*, 146 F.3d 502, 513 (7th Cir. 1998)). However, a defendant who has "challeng[ed] factual evidence of guilt as well as legal principles," is generally not eligible for a offense level reduction pursuant to § 3E1.1. *Id.* (citing *Bonanno*, 146 F.3d at 513; *United States*

*v. Muhammad*, 120 F.3d 688, 701–02 (7th Cir. 1997)). Ultimately, for the adjustment to be applicable "a defendant also must admit, or not falsely deny or frivolously contest, any relevant conduct as it relates to the offense of conviction to be eligible for an acceptance-of-responsibility reduction." *United States v. Booker*, 248 F.3d 683, 690 (7th Cir. 2001) (citing U.S. Sentencing Guidelines Manual § 3E1.1 application n.1(A); *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir. 1999)).

A defendant's conduct showing his or her acceptance of responsibility must be considered in tandem with any conduct that obstructs justice, as "a defendant who has obstructed justice is presumed not to have accepted responsibility." *United States v. Furando*, 655 F. App'x 507, 510 (7th Cir. 2016) (quoting *United States v. Buckley*, 192 F.3d 708, 711 (7th Cir. 1999)); *see also* U.S. Sentencing Guidelines Manual § 3E1.1 application n.4. However, this presumption can be rebutted in extraordinary circumstances. *Furando*, 655 F. App'x at 510; *see also* U.S. Sentencing Guidelines Manual § 3E1.1 application n.4 (U.S. Sentencing Comm'n 2018). To rebut the presumption, the defendant "must show either that the obstruction was trivial (causing no extra expense to the government) or that he made up for his obstruction by taking more than the routine steps that normally earn the discount." *Furando*, 655 F. App'x at 510 (citing *United States v. Hacha*, 727 F.3d 815, 818 (7th Cir. 2013)).

The PSR concluded that the Defendant "has not clearly demonstrated acceptance of responsibility for the offense" and therefore did not recommend a § 3E1.1 adjustment. PSR ¶ 48. The Government does not object and agrees that the Defendant's conduct does not warrant the adjustment. Gov't's Resp. to Def.'s Objections ¶¶ 9–10. The Defendant objects, arguing that the "Defendant's only motivation for proceeding to trial was to preserve appeal rights to decisions

made on pretrial motions involving the Defendant's claims of inappropriate conduct on the part of government agents." Def.'s Objections ¶ 38.

In the instant case, the Defendant proceeded to a three-day bench trial instead of entering a plea of guilty. After the trial, the Defendant filed a Supplemental Proposed Findings of Facts and Conclusions of Law [ECF No. 424], which argued that the Government did not meet its burden and called for the Defendant's release from custody. Since that time, the Defendant has filed several motions and objections, many of which are not supported by law or facts. The Defendant's continuous false and frivolous denial of relevant conduct and challenges to his conviction and sentence illustrate that he has not accepted responsibility for his conduct. Furthermore, the Court has concluded that the Defendant obstructed justice. As such, an adjustment under § 3E1.1 is presumed inapplicable. This presumption cannot be overcome because the Defendant's obstruction was not trivial, as it required law enforcement to coordinate across international boundaries, and the Defendant did not take more than the routine steps—or even the routine steps—that normally invoke the adjustment. For these reasons, it is apparent to the Court that a § 3E1.1 adjustment is not warranted.

**E.      Criminal History Computation**

In conjunction with calculating a defendant's offense level, sentencing courts must also compute a defendant's criminal history score and category by using the values assigned to prior convictions as detailed in Chapter Four of the Sentencing Guidelines. U.S. Sentencing Guidelines Manual § 4A1.2 (U.S. Sentencing Comm'n 2018). The Guidelines instruct that "[a]ny prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted." *Id.* at § 4A1.2(e)(1). A sentencing court is to "[a]lso count any prior sentence of imprisonment

exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id.* The Guidelines further instruct that "[a]ny prior sentence that was imposed within ten years of the defendant's commencement of the instance offense is counted" regardless of the term of imprisonment. *Id.* at § 4A1.2(e)(2). Older sentences may be considered to determine whether an upward or downward departure is warranted; however, they are not used for calculating a defendant's criminal history score. *Id.* at § 4A1.2(e)(3), application n.8.

The PSR has computed the Defendant's criminal history score to be six, which results in a criminal history category of III. PSR ¶ 76. The Government does not object to this computation. The Defendant objects to the inclusion of certain convictions, arguing that they "do not count toward his Criminal History Category computation because of how long ago they were committed," Def.'s Objections ¶ 126. He also objects to the inclusion of certain arrests because they did not result in conviction. PSR ¶¶ 79–81.

The PSR relied on two of the Defendant's past convictions to calculate a criminal history score of six. The first conviction was for robbery. *Id.* at ¶ 63. The Defendant was convicted of this crime on February 5, 1997, and was sentenced to 10 years imprisonment. *Id.* The Defendant was released from custody on March 14, 2003. *Id.* The second conviction was for being a felon in possession of a firearm. *Id.* at ¶ 71. The Defendant was convicted of this crime on January 15, 2002 and was sentenced to 70 months imprisonment and 3 years of supervised release. *Id.* The Defendant was released from custody to supervised release and supervised release was terminated on April 6, 2006. *Id.*

The fifteen-year period begins at the "commencement of the instant offense" which, in the instant case, would be when the Defendant began selling drugs as a member of the DTO. *See*

*United States v. Murray*, 571 F. App'x 477, 479 (7th Cir. 2014). The PSR indicates that the Defendant first became involved with the DTO in either 2009 or 2010. PSR ¶ 9. Although the exact date is not known, the aforementioned convictions fall within the fifteen-year time period regardless of whether the instant offense commenced in 2009 or 2010. Therefore, these convictions must be used to determine the Defendant's criminal history score. Both convictions carried a "sentence of imprisonment exceeding one year and one month"; therefore, both add three points to the Defendant's criminal history score, which equates to a criminal history category of III. U.S. Sentencing Guidelines Manual § 4A1.1(a) (U.S. Sentencing Comm'n 2018).

In addition to the above described convictions, there are several other convictions detailed in the PSR. To the extent the Defendant is also objecting to the inclusion of these convictions, his objection is overruled. These convictions are properly included in the PSR because the Court may consider every prior conviction and sentence to determine if the Defendant's conduct and criminal history warrant an upward departure. U.S. Sentencing Guidelines Manual § 4A1.1(a) application n.9 (U.S. Sentencing Comm'n 2018).

The Defendant also objects to the PSR's inclusion of arrests that did not result in a conviction. The Court cannot consider an arrest record to determine whether a departure is necessary, *id.* at § 4A1.3(a)(3); therefore, to the extent the PSR contains facts and details concerning only a record of arrest, the Court will not consider such facts and details for the purpose of sentencing.

## CONCLUSION

For the reasons state above the Government's objections are SUSTAINED and the Defendant's Objections are SUSTAINED in part and OVERRULED in part. The Court, based on the facts and details in the PSR, CONCLUDES:

- The Defendant's base offense level is 36 pursuant to Sentencing Guidelines § 2D1.1(a)(5), (c)(2).

- The conduct relevant to this offense warrants a two-point offense level increase pursuant to Sentencing Guidelines § 2D1.1(b)(1).

- The conduct relevant to this offense does not warrant a two-point offense level increase pursuant to Sentencing Guidelines § 2D1.1(b)(2).

- The conduct relevant to this offense warrants a two-point offense level increase pursuant to Sentencing Guidelines § 2D1.1(b)(12).

- The Defendant did not serve as an organizer, leader, supervisor, or manager and; therefore, an adjustment pursuant to Sentencing Guidelines § 3B1.1 is not warranted.

- The Defendant obstructed justice, and, therefore, an upward adjustment of two points pursuant to Sentencing Guidelines § 3C1.1 is warranted.

- The Defendant has not accepted responsibility for his conduct, and, therefore, an adjustment pursuant to Sentencing Guidelines § 3E1.1 is not warranted.

- The Defendant's total offense level is 42.

- The Defendant's Criminal History Category is III.

SO ORDERED on March 11, 2020.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT